Argued and submitted October 26, 2001, reversed March 20, 2002

In the Matter of Mariana Simon,
Alleged to be a Mentally Ill Person.

## STATE OF OREGON,
*Respondent,*

*v.*

## MARIANA SIMON,
*Appellant.*

0009-70124; A111912

42 P3d 374

David L. Smedema, Judge pro tempore.

Kirkland T. Roberts argued the cause and filed the brief for appellant.

Erika L. Hadlock, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

EDMONDS, P. J.

**EDMONDS, P. J.**

Appellant seeks reversal of a judgment that adjudicated her to be a mentally ill person and committed her to the Mental Health Division. ORS 426.130. The trial court committed appellant because it believed that her disorder made her a danger to herself. ORS 426.005(1)(d). On *de novo* review, ORS 19.415(3), we reverse.

Appellant is a 51-year-old woman with a bipolar disorder. She immigrated from Romania to the United States more than 18 years ago. She lives with her adult son, Zdrantan, has a driver's license, is able to shop and prepare food for herself, and is generally physically healthy. However, appellant was brought to a mental health facility after becoming aggressive in an encounter with her son and a police officer. There were also concerns about reckless driving and some social encounters in which appellant confronted her neighbors aggressively about her belief that they were practicing witchcraft against her. During her prehearing hospitalization, appellant refused some of the medications that she was offered and was aggressive when an investigator attempted to interview her. The precommitment investigator, Coker, recommended commitment.

At the hearing, the state presented evidence showing that appellant had attempted suicide eight years previously and that she had recently stated that she wanted to die. According to Zdrantan, she has an 18-year history of mental health problems, and she has a tendency to become more aggressive and extreme in her behavior when she decreases or stops her dosages of medication. Zdrantan testified that he believed that appellant had lost weight rapidly in the month before the hearing and that she had not been sleeping through the night. He testified that he had seen her drive too fast through their residential neighborhood, that he knew of one car accident that appellant had caused in the last six months, and that appellant was confrontational with him and with neighbors about spiritual matters. He testified that, while none of the confrontations had involved physical contact, they had caused the neighbors to be stressed and distraught. He acknowledged that appellant had not physically

threatened anyone in any fashion. He said that appellant had once tried to injure him physically and that she was occasionally destructive of his personal property and her own clothes. He also said that, since he had taken the car away from his mother, her driving no longer posed a threat. He testified that, if appellant were released, he would take her back into his home but that he would not be able to provide constant supervision. He also testified that appellant "had depression to where she says she wants to die. She hasn't attempted suicide lately. * * * She's not obsessed with suicide lately, no."

Coker testified about his interview with appellant during her prehearing hospitalization. He stated that he found appellant to be very agitated and confrontational with him. His observations were that she was preoccupied with her perception that witchcraft was being practiced against her and that the medication she was being offered was harmful to her. During their interview, appellant shouted, "God, take my life, I don't care anymore, and God knows my situation." Coker was unable to complete his interview because of appellant's hostility.

Appellant testified at the hearing that she had been taking medication for her disorder as needed but that she did not always take the prescribed dosage because of unpleasant side effects, including an upset stomach and drowsiness. She testified that she had refused some medication in the hospital because it was offered without a meal and that she knew that she had to take the medication with food. She testified that she knew she had a mental problem, which she characterized as depression or sadness that was brought on by the loss of custody of her children to her ex-husband and also by the practice of witchcraft against her. She explained that she had been in her most severe state of depression when she attempted suicide eight years before, because she had just lost custody of her children, but that she was not experiencing any suicidal feelings or desires to hurt others presently.[1]

---

[1] Appellant testified:

"That was long time ago, as how many as probably seven years ago. Right after they took the children away I was—I couldn't take the pain. I didn't know what was going to happen to my daughters. I was afraid they were going to give them for adoption. And I loved them that much that I say I better to die than go through that pain."

She testified that she receives social security disability benefits of $556 per month, that she has participated in mental health treatment through the Mt. Hood Mental Health clinic, that she has a caseworker there, and that she will continue to take her medication as needed. Her stated plan, if she were released by the court, was to return to live with her son, continue with treatment at the mental health clinic, pray and eat something, and then look for a lawyer to help her in getting custody of her children. She focused heavily on her belief that her illness had been caused by others who, in concert with her ex-husband, practiced witchcraft against her. In what both examiners referred to as "religious preoccupation," appellant explained that she believed that the practice of witchcraft against her was partially responsible for her illness.

In response to questions from the mental health examiners at the hearing, appellant explained that she was willing to take those medications that make her feel better but that she did not want to be forced to take medication. She also said that she would not take medication when a doctor thought she needed it but would do so "whenever I'm depressed." She explained that she had been angry while driving and that she had pulled out in front of some young children but that she had always obeyed the speed limit. She testified that the extent of her current suicidal feelings was to "stay in the bed and cry and pray and say, 'God take me home because this is not life.' " She testified that she was willing to continue seeking treatment at the Mt. Hood Mental Health clinic and that she had missed only one appointment. She was unable to remember the dates of past hospitalizations but acknowledged that she had been in other hospitals for treatment. She was asked what she would wish for, if she had three wishes. Appellant first explained that her religious beliefs did not permit her to engage in "wishing" but that the three things she wanted most were to see her children, raise

She was then asked whether she continued to have those same feelings, and was confronted with a statement she made to Coker that she wanted God to take her life. She responded:

"If I told [the precommitment investigator] that, I say that I love my children to death. That much I love them."

them correctly and in the church, and to live to see her son get married.

The first examiner concluded that appellant was dangerous to herself and to others but that she was able to provide for her basic personal needs. His written observations recite that appellant.

"[h]as seemingly fixed level of belief-function based on witchcraft and religious belief. Numerous hospital admission with ongoing-recurring problems. These issues with self care?? Much is directed to daughters-their treatment, needs. Issues create problems in life.

"Longstanding, chronic recurring behavior patterns, beliefs, thoughts. Religious fixation, preoccupation, belief. Poor insight to her behavior, meds. Poor response to past treatment, but still needs more treatment."

The other examiner found that appellant was dangerous to herself and others, commenting that she was "unable to stay out of harm's way." He wrote:

"Long history of mental illness with 6 prior civil commitments since 1992. Grossly delusional with paranoid ideation. Believes witchcraft controls her. She admits to driving when mad, has threatened son and admits to weight loss in last month. She believes children are being sexually molested because of witchcraft and is impulsive in trying to confront her delusional beliefs with unpredictable behavior.

"Bizarre, confused * * * mood is tearful, labile with impaired judgment and insight. Significant paranoid delusion with * * * religious preoccupation. Thought context and thought processes are disturbed. Her behavior is unpredictable with impulsive dangerous behavior. Unable to articulate a plan of self-care. She has been non-compliant with medication and missed appointment with out-pt. provider."

The trial court found that appellant was not dangerous to others, because the evidence was not sufficient to show that she posed a threat of physical danger. For that conclusion, it relied on the fact that she no longer had access to the car, which was the only physical threat the court believed had been established. As to her ability to provide for her own

basic needs, the court held that her current living situation "apparently is still available" and that there was "not a sufficient showing to find that she's unable to provide for her basic needs." However, as to appellant's alleged dangerousness to herself, the court ruled:

> "In relation to whether it's sufficient to show she's, by clear and convincing evidence, she's dangerous to herself, *it's close.* I will make a finding that it is sufficient and I will order a commitment relying on the evidence showing that *while her attempts at suicide are old, that's still sort of constantly on her mind.* The evidence is clear she's not taking medications and I'm relying to a great extent on the two examiner['s] opinions." (Emphasis added.)

Appellant challenges that conclusion on appeal.[2] She contends that the court was required by the governing statute to focus on existing conditions or her current mental status, and not on the evidence of past suicide attempts. She says that there is insufficient evidence to show any likelihood of another suicide attempt in the near future.

■    ORS 426.005(1)(d) defines a "mentally ill person" as one:

> "[w]ho, because of a mental disorder, is one or more of the following:
>
> "(A)   Dangerous to self or others.
>
> "(B)   Unable to provide for basic personal needs and is not receiving such care as is necessary for health or safety."

Because of the "clear and convincing evidence" standard imposed by statute, the dangerousness to self must be "highly probable." *State v. Stephens,* 178 Or App 31, 38, 35 P3d 1061 (2001). The state concedes on appeal that it did not prove that appellant is unable to care for her basic needs or that she is dangerous to others. As the trial court noted, the only evidence tending to show dangerousness to self on this record is the evidence that appellant is a potential suicide risk. Thus, our inquiry on *de novo* review is whether it is

---

[2] Defendant's first assignment of error challenges the admission of a document entitled "Notice of Treatment Prior to Hearing" that was received at the hearing. Because of our disposition on the second assignment of error, regarding whether the evidence supports her commitment, we do not address the first assignment.

highly probable that appellant is likely to attempt suicide again in the near future.

■       Based on our *de novo* review of the record, we disagree with the trial court's finding that it is highly probable that appellant was dangerous to herself at the time of the hearing. We reach that finding after reviewing the evidence of the factors and behaviors present in appellant's life during the time she attempted suicide in the past and then comparing them with the evidence of her present circumstances. When defendant attempted suicide in the past, the trauma of losing custody of her children and her husband was very recent. She was coping with her belief that her children had been molested by her ex-husband. She had reportedly lost a large sum of money through theft by one of her ex-husband's friends, and she and the children were also physically ill.

In contrast, appellant testified that, at present, her periods of depression involve lying in bed and crying, but that they last only a few hours. Then she gets up, cooks something and eats, and then goes out. She repeatedly denied presently having suicidal feelings. She explained that she has not seen her children for four years and that her current approach to that concern is to seek a lawyer to help her in her legal struggle for custody. She also stated that she has recently come to believe that her children have been molested by a classmate but that her response to that has also been to seek legal counsel.

As to his observations of her present suicidal tendencies, appellant's son testified:

"Q.   Has your mother expressed to you feelings that she has wanted to die?

"A.   Yes.

"Q.   How often has she expressed that?

"A.   Lately not as much. She says that when she's depressed. But she has not tried any suicidal attempts lately.

"Q.   Okay. When was the last time that you were aware of?

"A.   That was when she did the—well, she took pills a few years back[3] and she took my stereo in the bathtub

---

[3] Both of the events reported by the son occurred in 1991 and 1992.

with her and that was soaked, a couple of attempts that I know of."

On cross-examination, the son was asked, "[B]ut she hasn't made any references recently?" and he replied, "She said that she, you know, wants to die. * * * She wanted to die, but she hasn't attempted to commit suicide." He said that he heard her say that she wished she were dead "a few weeks ago," and that, "when she gets depressed, she may want that, but she hasn't had any recent attempts that I'm aware of."

■      Predicting future human behavior is an inherently speculative endeavor. When the legislature imposed a burden of persuasion of clear and convincing, or highly probable, evidence, it sought to ensure that involuntary commitment and the deprivation of liberty that accompanies it would not occur except when based on evidence of "extraordinary persuasiveness." *State v. Johnson*, 131 Or App 561, 564, 886 P2d 42 (1994). Defendant's statements that she wishes at times that she were dead are troubling from a perspective of a treating physician or counselor, but they do not rise to the level of clear and convincing evidence, as required by the statute, that she is likely to attempt to take her own life in the near future. *See State v. Alexander*, 26 Or App 943, 554 P2d 524 (1976) (holding, under a reasonable doubt standard, evidence insufficient to support commitment where the only evidence about dangerousness to self was that the allegedly mentally ill person once said she would like to be dead and another witness believed there would be a problem with suicide if the person lived alone); *cf. State v. Brungard*, 101 Or App 67, 789 P2d 683, *mod on recons* 102 Or App 509 (1990), *rev den* 311 Or 427 (1991) (upholding a commitment based on "rapid" changes to eating and sleeping patterns, intense social isolation, and the fact that a past suicide attempt was accompanied by identical behavior);[4] *State v. Lucas*, 31 Or

---

[4] In *Brungard*, we said:

"We agree that due process does not require that the state wait for the moment when appellant would again try to take his own life before involuntarily committing him for treatment." 101 Or App at 73.

In that case, however, the appellant had suffered a rapid change in his social and self-care behavior during the two to three weeks before the hearing, he had completely stopped taking his medication, and there was a direct medical correlation, established in the record, between his refusal to take his medication and his past suicide attempt.

App 947, 571 P2d 1275 (1977) (person's recent statements about an "appointment with Jesus," lying on the floor of a cell in the shape of a cross, and self-injurious, suicidal behaviors were not sufficient evidence of continued danger to self when allegedly mentally ill person had improved before the hearing). The evidence before us fails to rise to the level of persuasiveness that the statute requires, and we therefore reverse.

Reversed.