Argued and submitted June 26, reversed and remanded with instructions
August 28, 2002

In the Matter of Coenia Schaefer,
Incapacitated Person.

Roger SCHAEFER,
*Respondent,*

*v.*

Coenia SCHAEFER,
*Appellant.*

20534; A115334

52 P3d 1125

Lynda Clark argued the cause for appellant. With her on the brief was Legal Aid Services of Oregon, Albany Regional Office.

Roger Schaefer waived appearance for respondent.

Before Landau, Presiding Judge, and Brewer and Schuman, Judges.

SCHUMAN, J.

**SCHUMAN, J.**

Coenia Schaefer appeals from an order appointing her son Roger Schaefer as her legal guardian.[1] We reverse and remand.

On *de novo* review, ORS 111.085(7); ORS 19.415(3), we find the following facts. At the time of trial, appellant was 86 and lived alone in her own home, as she had for the previous 26 years. She cared for her collection of pets (many cats and a dog), handled her own finances with minimal assistance, did most of her own shopping and food preparation, and kept a neat house—albeit a foul-smelling one, owing apparently to the cats. She used a walker to move about and took a taxi when she needed to go to the grocery store or the bank. She occasionally experienced memory lapses and mental confusion; for example, she thought a picture of herself and her husband was a picture of herself and her son, she had a hard time remembering what day of the week it was, she did not know how much money was deposited automatically each month in her bank account, and she could not recall if a certain prescription was for tablets or capsules. Further, she was under a doctor's instructions to take what she referred to as "water pills" for edema but, because she found that they made her go frequently to the bathroom, a troublesome task given her age and limited mobility, she chose not to take them. As a result, she occasionally suffered from severe blisters on her feet and swelling. On at least two occasions, her condition was bad enough to prompt her to go to the emergency room. Over the years, she had occasionally told people that she was so attached to her house and pets that rather than move away she would have the pets put to sleep and shoot herself.

On April 25, 2001, respondent filed papers with the circuit court seeking temporary and permanent guardianship of appellant, alleging she was "incapacitated and there is an immediate or serious danger to [her] life or health." The court granted the temporary guardianship on April 30 and

---

[1] Ms. Schaefer was respondent below and is appellant here; Roger Schaefer was petitioner below and is respondent here. To avoid confusion, we refer to Ms. Schaefer as appellant and her son as respondent.

appointed a "visitor" with instructions to submit a report. ORS 125.150; ORS 125.155. The visitor, who had a good deal of experience but no formal medical training or college degree, interviewed appellant for 90 minutes and found her to have "dementia" and "problems with long and short term memory." She found no immediate danger to appellant with respect to food, clothing, and shelter. Nonetheless, her fill-in-the-blanks report to the court recommended appointment of a guardian because appellant "refuses to take doctor's advice and medications that are vital to her life and threatens suicide if she's moved from her home. She is unable to reason with [sic] because of her dementia."

Two days after being served with notice that respondent was seeking the guardianship, appellant filed an objection with the court. ORS 125.070; ORS 125.075. She checked boxes next to typewritten statements asserting, "I do not want anyone else making any of my decisions for me," and "I do not want [respondent] making any decisions for me." In her own writing, she added that she did not want him deciding "where I live, who are my friends[,] who I see, what I do or anything else. In fact after this I don't want to see him again. From this day he is no longer welcome in my home." (Underscoring in original.) On discovering that respondent planned to move her into a care facility, she asserted, as she had in the past, that she would rather have her pets put to sleep and kill herself, although, as always, she took no steps to carry out that threat. On June 18, 2001, after a hearing, the Linn County Circuit Court granted the petition for permanent guardianship. This appeal followed.[2]

 Imposing a guardianship deprives a person of "precious individual rights." *Van v. Van*, 14 Or App 575, 581, 513 P2d 1205 (1973) (citation omitted). To protect those rights, the legislature has created a statutory process that surrounds the creation of guardianships with extensive procedural safeguards and substantive requirements. ORS 125.005 to ORS 125.730. A petitioner seeking to create a guardianship must establish that the proposed protected person is "incapacitated," defined as follows:

---

[2] Respondent filed no brief and informed the court that he "was not contesting the appeal." We do not take this ambiguous statement as a concession of error.

" 'Incapacitated' means a condition in which a person's ability to receive and evaluate information effectively or to communicate decisions is impaired to such an extent that the person presently lacks the capacity to meet the essential requirements for the person's physical health or safety. 'Meeting the essential requirements for physical health and safety' means those actions necessary to provide the health care, food, shelter, clothing, personal hygiene and other care without which serious physical injury or illness is likely to occur."

ORS 125.005(5). That definition requires a petitioner to prove three things: (1) the person to be protected has severely impaired perception or communication skills; (2) the person cannot take care of his or her basic needs to such an extent as to be life- or health-threatening; and (3) the impaired perception or communication skills *cause* the life-threatening disability. Thus, a person who is unable to care for herself because of physical deterioration cannot for that reason be subjected to a guardianship, nor can a person who has trouble processing information if she can still take care of herself. The key is the nexus between the inability to process and communicate information, on the one hand, and the inability to perform essential functions, on the other.

■ Further, a person over whom a petitioner seeks to establish a guardianship enjoys a " 'presumption of competency * * * [which] may be relied upon until the contrary is shown.' " *First Christian Church v. McReynolds*, 194 Or 68, 74, 241 P2d 135 (1952) (quoting 28 Am Jur 751, *Insane and Other Incompetent Persons*, § 121). That presumption must be overcome by clear and convincing evidence, ORS 125.305(1), that is, evidence of "extraordinary persuasiveness," *State v. DeMartino*, 164 Or App 331, 335, 991 P2d 1093 (1999).

■ In the present case, respondent falls far short of overcoming the presumption in favor of appellant's competence. Some evidence tends to show that her information-processing skills are mildly impaired. As described above, she suffers occasional memory lapses and episodes of mental confusion. But she is in no sense delusional, unable to understand what people are saying to her, unable to express her preferences, or in any other way unable to care for herself.

In concluding that appellant could not meet the essential requirements for her own health and safety, the trial court relied on three findings: (1) "suicidal ideations," (2) "unsanitary conditions, primarily the cat urine smell and whatnot, in the house," and (3) appellant's medical needs and her "unwillingness to take prescribed medications or unwillingness to cooperate with Home Health." No evidence in the record supports the finding that the smell of cat urine is anything but unpleasant. Appellant's daughter-in-law, her protective services case manager, and the court-appointed visitor all testified that appellant keeps a clean, neat, and orderly house. Like the smell of cigar smoke, boiled cabbage, or cheap cologne, the olfactory evidence of cats reflects a deliberate choice and not a health or safety hazard. Nor is there any evidence that it results from appellant's mental impairment. Suicide threats, of course, are always to be taken seriously, but in this case the record shows that appellant has made them "[o]ff and on through the years." In an analogous situation, we have stated that, under the clear and convincing evidence standard, mental commitment cannot occur based on suicide threats unless it is "highly probable" that the person in question is "likely to attempt suicide * * * in the near future." *State v. Simon*, 180 Or App 255, 262, 42 P3d 374 (2002). There is no evidence that appellant's threats were ever anything beyond mere talk. And most importantly, there is absolutely nothing in the record to indicate that the suicide threats are the result of diminished mental capacity. Indeed, the fact that she has made those statements in the past, when she was in complete control of her faculties, and that her recent statements occurred only after she learned that respondent planned to uproot her and separate her from her pets, negates the inference that her suicide threats somehow flow from any failure of "ability to receive and evaluate information effectively or to communicate decisions." ORS 125.005(5).

The most significant of the trial court's findings is appellant's periodic refusal to take prescribed edema medication, resulting in severe blistering and the need for emergency medical treatment. Once again, however, the record utterly fails to connect those actions to impaired "ability to

receive and evaluate information effectively or to communicate decisions." *Id.* Indeed, all of the witnesses who testified about this matter, including appellant herself, stated that her decision was a conscious one based on her calculation of the costs and benefits of taking or rejecting her medicine. We may find that calculation idiosyncratic or misguided (or we may not), but we cannot find it to be the result of an inability to process information, nor can we find that she is unable to communicate either the decision or its rationale.

In short, we agree that appellant shows some signs of impaired mental functioning and that she has made some decisions that appear to threaten her health. But no evidence whatsoever, much less clear and convincing evidence, supports the conclusion that those decisions are the result of impaired mental functioning. That connection is what the legislature has deemed to be the necessary prerequisite for establishing a guardianship.

Reversed and remanded with instructions to enter order terminating guardianship.[3]

---

[3] Appellant assigns error not only to the court's order appointing a guardian, but also to its earlier order appointing a temporary guardian and to its overruling of appellant's objection to the court-appointed visitor's testimony. Our decision that ordering the permanent guardianship was error obviates the need to address the other assignments.