173 P.3d 836 (2007)
216 Or. App. 395
In the Matter of C.R., Alleged to be a Mentally Ill Person.
STATE of Oregon, Respondent,
v.
C.R., Appellant.
050261666; A127867.
Court of Appeals of Oregon.
Argued and Submitted August 10, 2007.
Decided December 5, 2007.
*837 Liza Jane Langford, Portland, argued the cause and filed the brief for appellant.
Paul Crisalli, Certified Law Clerk, argued the cause for respondent. On the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Anna M. Joyce, Assistant Attorney General.
Before EDMONDS, Presiding Judge, and BREWER, Chief Judge, and SERCOMBE, Judge.
EDMONDS, P.J.
Appellant appeals a judgment committing her to the Department of Human Services, Mental Health Division. ORS 426.130. Appellant argues that the trial court erred in concluding that she suffers from a mental disorder and is a danger to herself. On de novo review, State v. Bodell, 120 Or.App. 548, 550, 853 P.2d 841 (1993), we conclude that the state failed to prove by clear and convincing evidence that she is a "mentally ill person" within the meaning of ORS chapter 426. Accordingly, we reverse.
In February 2005, appellant attempted suicide. Five months before the attempt, appellant, a librarian, researched how to commit suicide and obtained the necessary ingredients by ordering them from the Internet. In February, she mixed the concoction pursuant to the instructions that she had obtained from the Internet. Part of those instructions included the consumption of an anti-emetic and alcohol. Appellant ingested approximately three-eighths of the concoction but did not consume any alcohol with it. She then called her boyfriend to tell him that she was committing suicide. Appellant survived the attempt to commit suicide and did not seek medical help. Two days later, however, her boyfriend insisted she go to the hospital because he was afraid that she might have damaged her heart or liver by ingesting the concoction. At the hospital, a psychiatric hold was placed on appellant. While she was held, appellant had difficulty getting along with the hospital staff and was angry at being held against her will.
At appellant's commitment hearing, she admitted to suffering from depression and described the suicide incident as a "very serious" attempt to take her own life. However, when asked whether she thought she was ready to leave the hospital, she explained that she was no longer suicidal:
"I do not think that I am a danger to myself. The suicide attempt was stupid. It was a stupid thing, and I called my boyfriend and told him about it before I did it. (Inaudible) to be interrupted and to please stop.
"I have a life I would like to put back together. I have a job interview tomorrow for a job I really want. I have a 12 dollar an hour contract job with a nonprofit. I'm involved with [a library]. I have a commitment to them, and I would like to go back and fulfill that commitment. I have an appointment with a psychologist I was seeing last year. (Inaudible) she said she would work with me."
When asked why she would not attempt suicide again, she responded, "Fear. Having done it. I never want to do that again." Appellant explained that she had tried to ask for help prior to the attempt by trying to talk to her boyfriend and her friends about how she felt, but that she did not seek out therapy or call a crisis line because she had unhelpful experiences with them in the past. She went on to say that the crisis was over before she went to the emergency room and that she planned on controlling her depression through exercise and counseling.
The two examiners present at the hearing, Dr. McCubbin and Dr. O'Malia, opined that appellant suffered from depression that caused her to be a danger to herself. McCubbin diagnosed her with a "chronic severe depressive order" and a "likely personality disorder stemming from stated [post-traumatic stress disorder]," concluding:
"That she is dangerous to herself and able to care for her basic needs for food, but not for safety or survival. Dangerous to self and unable to provide for the safety and survival."
He also opined, "Her denial and pleasant manner make it difficult to say she is psychotic *838 but in my judgment, suicidal thinking is psychotic, and I see no evidence that it has lifted."[1]
O'Malia diagnosed appellant with depression and a borderline personality disorder, explaining that she was not psychotic,
"I think, given the whole picture, the depression is still there. It is in just a slightly different phase, but she was extremely angry during the hospitalization. She is just now starting medication which I think puts her at an extremely high risk. Unfortunately, anti-depressants are very lethal medications themselves. So if she has a medication available to her, she has just been handed another tool which she really doesn't need. She lives alone. She has admitted to problems with coping with things. And just because people are intelligent, that doesn't mean they are born knowing how to handle their problems. She is not involved with anybody at this time. She has a distrust of organized medication. She has self-discontinued her meds in the past. This attempt was so organized, we are just talking a few days ago, and when she woke up and discovered that she was still alive, she wept. I think that's not gone away in just a few days. I think she is at extremely high risk."
Although the trial court believed appellant was trying to be truthful, it explicitly relied on the examiners' opinions in committing appellant:
"Here is the situation. * * * [T]oday [appellant] is certainly presenting as a very intelligent person. Certainly, her responses today have been rational and they have not been psychotic. I must acknowledge that * * * she certainly has a plan. There is food, clothing, and shelter, that's not an issue.
"As I said before, the explanations certainly appear to be rational. However, I get to this one point that is sort of a hinge point and that is, do I believe [appellant] when she says she is not suicidal. I certainly believe that she is trying to tell me the truth, but at that point, of course, my lay abilities break down somewhat and certainly the Court does believe that there is a great need to turn to the medical professionals and mental health professionals who are here with me today.
"* * * * *
"I am going to adopt their findings and conclusions and incorporate them in my final decision."
To be involuntarily committed to the Department of Human Services, a person must be found "mentally ill." ORS 426.130(1)(b)(C). A person who is "mentally ill" includes one "who, because of a mental disorder, is * * * [d]angerous to self or others." ORS 426.005(1)(d)(A). Proof that a person is mentally ill must be established by clear and convincing evidence. ORS 426.130(1)(b). The clear and convincing evidence standard is met when the truth of the facts asserted is highly probable. State v. Evjen, 111 Or.App. 368, 371, 826 P.2d 92 (1992). Said otherwise, the evidence sufficient to support an involuntary commitment must be extraordinarily persuasive. State v. Simon, 180 Or.App. 255, 263, 42 P.3d 374 (2002). Medical care for a life-threatening condition is considered a basic need. However, before involuntary commitment is permitted under the governing statutes, the threat to life must be actual, rather than speculative. State v. Ayala, 164 Or.App. 399, 404-05, 991 P.2d 1100 (1999). Thus, the mere apprehension that a person may commit suicide is insufficient for commitment. Rather, the state must establish through the evidence that it is highly probable that an alleged mentally ill person will attempt to commit suicide in the near future and that the threat to the person's life arises because of the person's mental disorder. Simon, 180 Or. App. at 261-62, 42 P.3d 374.
After reviewing the record de novo, we conclude that the trial court erred in determining that there is clear and convincing evidence that appellant was subject to involuntary commitment at the time of the hearing. Preliminarily, we agree that there *839 is clear and convincing evidence, based on the examiners' assessment of appellant, that appellant suffered from depression, a mental disorder. However, it does not necessarily follow from the examiners' medical diagnoses that she was subject to involuntary commitment, a process that operates to deprive her of her constitutionally protected liberty interests. Rather, the trial court and we are required by ORS chapter 426 to make a determination that is factual in nature  whether it is highly probable, based on the evidence adduced at the hearing, that appellant was a danger to herself because of the severity of her mental disorder.
There is no evidence in the record that appellant was psychotic, delusional, or out of touch with reality either at the time that she attempted to commit suicide or at the time of the hearing. Indeed, O'Malia described appellant as "articulate" and "focused" and noted that "she presents very well." McCubbin described appellant as an "intellectual person," and the trial court described appellant as a "very intelligent person" whose "responses today have been rational and they have not been psychotic."
Appellant told the court unequivocally that she would not attempt suicide in the future and described in detail her plan of coping with her depression. We acknowledge that the trial court and the examiners were not required to accept appellant's statements at face value, particularly in light of the fact that they had the opportunity to observe her first-hand. However, there are no facts in the record that suggest persuasively that appellant was trying to deceive the court. Indeed, the trial court found, "I certainly believe that she is trying to tell me the truth." That finding suggests that the trial court must have believed that, because of the severity of her disorder, appellant was incapable of controlling her depression and thoughts of suicide in the near future. Otherwise, involuntary commitment would not have been legally warranted. We look then to the record before us to determine if it supports that thesis.
Our review of the record does not reveal any evidence that appellant could not control her actions or that she was incapable of making a volitional choice not to commit suicide in the future because of her depression. Rather, in addition to the inference that appellant attempted suicide as a result of her depression, there also exists a reasonable inference from the evidence in the record that appellant's decision to try to commit suicide was prompted by other circumstances in her life rather than "because of" her mental disorder as the statute contemplates.[2] For example, an inference arises from the evidence that appellant was trying to get the attention of her boyfriend with her actions. In that light, we are unable to say that one inference is highly probable to the exclusion of the other inferences available from the record.
Nonetheless, the state argues that the record demonstrates that appellant has an established pattern of conduct dangerous to herself. The state explains that "[w]hen a person has established a pattern of dangerous behavior, and when all the evidence indicates that there has been no change and he or she would likely fall back into that pattern, a person can still be deemed a danger to oneself." State v. Roberts, 183 Or. App. 520, 524, 52 P.3d 1123 (2002).
In Roberts, we reversed an involuntary mental commitment even though the alleged mentally ill person had a history of not taking prescribed medications and there was evidence of an unrebutted hearsay report that she had stepped off the curb into a busy street some unspecified number of times in the past. We observed that predicting human behavior is an inherently speculative endeavor and held that, "on the record before us, we do not find `extraordinar[ily] persuasive[]' evidence that appellant will wander into traffic and injure herself." Id. at 525, 52 P.3d 1123 (quoting Simon, 180 Or. App. at 263, 42 P.3d 374).
In this case, the "pattern" that the state relies on appears to be derived from a prior *840 call made by appellant's boyfriend to a crisis hotline regarding appellant's suicidal feelings at about the time that appellant ordered the ingredients for her concoction and what it characterizes as a "well planned, well researched, and very detailed suicide attempt" that was unsuccessful, in the state's view, only by reason of being interrupted by her boyfriend. According to the state, "appellant's condition was one that must be treated with lethal anti-depressants, and to hand those medications to someone who had just attempted suicide by crushing and eating various pills would be to hand appellant the means with which to attempt to commit suicide again." Initially, we note that appellant testified at the hearing that she did not intend to take medication for her depression; rather, she said she planned to go to counseling and to exercise. But more importantly to the issue of whether appellant has a history of suicide attempts, there is no evidence of a pattern of attempts to commit suicide in the past; rather, the evidence shows only preparations over a five-month period that culminated in a single ingestion of a nonlethal amount of drugs.
In sum, before involuntary commitment is warranted, the state was required to prove by clear and convincing evidence that it was highly probable that appellant would again attempt to kill herself because of her mental disorder. ORS 426.130(1)(b). We find little in this record to support the state's assertion that it satisfied its burden of proof. We do not question the good-faith apprehension of the examiners that appellant was not emotionally stable enough to ensure that she would not repeat her suicide attempt, but the legal standard for involuntary commitment requires more than a good-faith apprehension on their part. Even if it is inferred that appellant's past actions were intended to take her life, the state was required to show by clear and convincing evidence that her depression at the time of the hearing was so severe that she was a danger to herself. In the context of appellant's rational presentation at the hearing and her personal plan to deal with her depression, the evidence simply does not demonstrate that it was highly probable at the time of the hearing that appellant would repeat her suicide attempt.
Reversed.
NOTES
[1] McCubbin asked appellant to define "psychotic," which appellant defined as "[n]ot able to judge reality perfectly." McCubbin responded that appellant's definition was "as good a definition [as] there is."
[2] ORS 426.005(1)(d)(A) defines a "mentally ill person" for purposes of involuntary commitment as "a person who, because of a mental disorder," is, among other things, "[d]angerous to self * * *." (Emphasis added.)