DEHOOG, J.
*121 In this juvenile dependency case, the Department of Human Services (DHS) appeals a judgment dismissing its petition to terminate mother's parental rights under ORS 419B.500 to 419B.524. Following a three-day termination trial, the juvenile court found mother to be unfit due to conduct or conditions seriously detrimental to her then four-year-old son, R (child). The court further found integration of child into mother's home unlikely to occur within a reasonable time, because the conduct or conditions were not likely to change. In deciding whether to terminate mother's parental rights, however, the court concluded that DHS had not established by clear and convincing evidence that *89 it would be in child's best interests to be freed for adoption.
DHS argues on appeal that, in the absence of evidence that termination of mother's parental rights would result in serious emotional or psychological harm to child or that termination would deprive him of a benefit that he would otherwise enjoy, the juvenile court could only conclude that adoption was in child's best interests. In DHS's view, once the court found that DHS had established that mother was unfit and that integration into her home within a reasonable time was improbable, termination of mother's parental rights became the default outcome. Mother responds that no law creates the presumption that DHS advances and that DHS's reliance on Supreme Court dictum from the Supreme Court's decision in State ex rel. Juv. Dept. v. Geist , 310 Or. 176, 796 P.2d 1193 (1990), for that proposition is misguided. Mother further argues that the evidence fails to establish that termination-rather than a less permanent option, such as a guardianship-is in child's best interests.
For the reasons that follow, we conclude on de novo review that DHS has established by clear and convincing evidence that there are grounds to terminate mother's parental rights and that it is in child's best interests to do so. In light of that conclusion, we reverse and remand. Because we decide this case on that basis, we do not consider whether, as DHS contends, the juvenile court was required to terminate mother's parental rights under the circumstances of this case.
*122 I. LEGAL STANDARDS
We have recently described the standards that apply to termination of parental rights cases as follows:
"In order to terminate a parent's rights on the basis of unfitness, a court must find that (1) the parent has engaged in conduct or is characterized by a condition that is seriously detrimental to the child; (2) integration of the child into the parent's care is improbable within a reasonable time due to conduct or conditions not likely to change; and (3) termination is in the best interests of the child. ORS 419B.500 ; ORS 419B.504 ; State ex rel. SOSCF v. Stillman , 333 Or. 135, 145-46, 36 P.3d 490 (2001).
"The state must establish the statutory grounds for termination by clear and convincing evidence. ORS 419B.521(1). Evidence is clear and convincing when it makes the existence of a fact 'highly probable' or when it is of 'extraordinary persuasiveness.' State ex rel Dept. of Human Services v. Smith , 338 Or. 58, 79, 106 P.3d 627 (2005) ; State v. M.S. , 180 Or. App. 255, 263, 42 P.3d 374 (2002)."
Dept. of Human Services v. R. K. , 271 Or. App. 83, 88, 351 P.3d 68, rev. den. , 357 Or. 640, 360 P.3d 523 (2015).
On appeal "from a judgment in a proceeding for the termination of parental rights," we "try the cause anew upon the record." ORS 19.415(3)(a). That is, we review de novo . We have further explained that,
"[i]n reviewing de novo a judgment terminating parental rights, an appellate court determines anew whether to terminate a parent's parental rights, giving 'considerable weight to the findings of the trial judge who had the opportunity to observe the witnesses and their demeanor in evaluating the credibility of their testimony.' "
R. K. , 271 Or. App. at 89, 351 P.3d 68 (quoting Geist , 310 Or. at 194, 796 P.2d 1193 ). We proceed to consider DHS's appeal with those standards in mind.
II. BACKGROUND AND PROCEDURAL HISTORY
The record in this case is extensive. However, mother does not dispute that DHS has established by clear and convincing evidence the first two predicates for termination of *123 her parental rights-that mother is presently unfit due to conduct or conditions seriously detrimental to child and that child's integration into mother's home is unlikely to occur within a reasonable time, because those circumstances are unlikely to change. Accordingly, we provide only so much detail regarding the factual and procedural history of this case as is necessary to give context to the contested issue, which is whether termination of mother's parental rights is in child's best interests. *90 A. Dependency Petition
Child was born June 27, 2012. In September 2014, DHS filed a petition alleging child to be within the juvenile court's jurisdiction. On November 17, 2014, based on admissions by mother and father, the court found child to be within its jurisdiction and placed him in DHS custody. As bases for its jurisdiction, the court found that mother's substance abuse interfered with her ability to safely parent child; that she had exposed child to people who possessed drugs and engaged in criminal activity; and that she had failed to maintain a safe environment for child, in that controlled substances and/or drug paraphernalia were found within his reach. The court separately found the same jurisdictional bases as to father.[1] The court ordered mother and father to engage in substance-abuse assessments and complete the recommended treatment, to submit to drug testing, and to obtain psychological evaluations and participate in any recommended services. The court also ordered both parents to abide by the terms of their probation, to develop an in-home safety plan, and to maintain safe and stable housing.
B. Permanency Proceedings
The juvenile court held a permanency hearing on February 23 and 24, 2016. At the conclusion of that hearing, the juvenile court issued a detailed letter ruling in support of its decision to change child's plan from reunification to *124 adoption. The court found that, despite DHS's reasonable efforts, neither mother nor father had made sufficient progress toward meeting the expectations previously ordered and that child could not safely be returned to either parent's care.[2] See ORS 419B.476(2)(a) (requiring, at permanency hearing, that the court determine whether DHS has made reasonable efforts to make it possible for child to safely return home and whether parent has made sufficient progress toward that objective).
In rejecting mother's request for more time in which to complete services, the court acknowledged that mother had started and even completed some of her required services. The court noted, however, that mother had taken nearly a year to engage in her drug and alcohol assessment, apparently because she had not become serious about following through with expectations until DHS began to consider changing child's plan. The court acknowledged that mother had ultimately obtained the required evaluation and had, for the most part, appropriately engaged in treatment, but found it significant that mother had recently been indicted for possession of heroin, leading her treatment provider to recommend that her program be extended indefinitely. The court also noted that mother had provided only four urinalysis samples during the pendency of her juvenile court case, all of which revealed the presence of "drugs in her system including opiates, morphine, codeine and cannabis."[3] Regarding mother's ongoing drug use, the court relied in part on a psychological assessment completed by Dr. Morrell between September 29, 2015 and January 26, 2016. Among other significant concerns, Morrell diagnosed mother with Somatic Symptom Disorder, Opioid Related Disorder, and Cannabis Related Disorder, and found that mother had been engaging in deceptive, drug-seeking behavior with various treatment providers. Morrell's assessment was that mother's various *125 diagnoses would require at least a year-and more likely two to three years-to treat sufficiently to allow child to safely return to mother's care.
In concluding that a change of plan was warranted, the juvenile court found it particularly *91 significant that mother had failed to provide a safe home for child. The court noted that one basis for jurisdiction had been that controlled substances and/or drug paraphernalia had been found in the home within child's reach, yet DHS had been thwarted in its efforts to enter the home to determine whether that concern had been ameliorated. Moreover, at the time of the permanency hearing, father, who was actively addicted and continued to use heroin, also continued to live in the same household as mother. Although many other people, including Morrell, child's grandmother, mother's drug counselor, and DHS workers, had discussed with mother the risk that father's active addiction presented to child, father had not moved out, because he had not been ordered to do so by the court.[4]
Even after recognizing mother's recent successes-including her "very satisfactory" engagement in drug treatment, her active participation in a church-based 12-step program, her improved attendance at parenting-time visits, and her completion of a parenting program that her probation officer had ordered-the juvenile court concluded that, taking child's health and safety as the paramount concerns, it was time to change child's plan to adoption. See id . (prioritizing the child's health and safety in permanency decisions). In finding that child could not safely return home, the court cited the foregoing evidence and expressly noted Morrell's recommendation against reunification at that time. The court also noted that child had been in substitute care "for 17 months, a good portion of his life," and that best practices required that children be given permanency. Finally, the court found that DHS could not, by itself, make it possible for child to return home within a reasonable period of time.
*126 Significantly, the juvenile court stated that it was
"emphasiz[ing] that this case is not over. DHS has stated that they will continue to work with the parents with the hope that they will be able to complete services and become viable resources for their child. In the event that this does not happen, then the agency will be on its way to complete the plan of adoption and provide the child with the necessary permanency."
C. Termination Trial
On April 8, 2016, DHS filed a petition to terminate mother's parental rights to child. Following a three-day trial held September 27 to 29, 2016, the juvenile court dismissed DHS's petition.[5] As noted, the court found by clear and convincing evidence that
"mother is unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the mother's home is improbable within a reasonable time due to conduct or conditions not likely to change, including the following:
"a) Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.
"b) Lack of effort or failure to obtain and maintain a suitable or stable living situation for the child so that return of the child to the parent is possible.
"c) Failure to present a viable plan for the return of the child to the parent's care and custody.
"d) An emotional illness, mental illness, or mental deficiency of such nature and duration as to render the parent incapable of providing care for extended periods of time.
"e) Lack of effort to adjust the parent's circumstances, conduct or conditions to make return of the child to the parent possible.
*92 *127 "f) Failure to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."
Notwithstanding those findings, the juvenile court did not terminate mother's parental rights. Instead, the court dismissed DHS's petition because it concluded that DHS had not established by clear and convincing evidence that it was in child's best interests to be freed for adoption. In its own, thorough opinion, the court explained its findings and conclusions.
Of central importance to the juvenile court was mother's longtime struggle with substance abuse. Mother, who was 25 years old at the time of the termination trial, first used heroin when she was 13. In a drug assessment in August 2015, mother stated that her heroin use was to manage pain due to serious back problems and other medical issues, and that her use had been heaviest in the preceding year and a half. Although she subsequently engaged in substance-abuse treatment and, according to the director of her drug program, "appeared to be responding well to treatment overall" as of the February 2016 permanency hearing, her recent arrest for possession of heroin and her ongoing close relationship with father were cause for concern at that time.
After the permanency hearing, mother progressed poorly with drug treatment. In April 2016, her counselor threatened to terminate her participation due to her positive urinalysis results, her inconsistent attendance, and her apparent lack of improvement. The program director agreed to give her a "last chance" contract with very specific conditions, including that she attend all groups-including a chronic pain group-that she submit to drug testing on request, and that she cease all use of opioid painkillers. Despite that last opportunity, mother tested positive for heroin in May 2016. Although mother admitted that she was again using heroin, she explained that her use was to treat withdrawal pains she suffered when she tried to comply with the requirement that she not use opioid painkillers.
The juvenile court stated that it had no reason to disbelieve that mother suffered from chronic pain. However, *128 the court explained, mother's drug use both predated the apparent onset of her back problems and had developed into ongoing substance-abuse issues that mother admitted prevented her from being able to safely parent child. Moreover, mother lacked an appropriate support group, her urinalysis results belied her attempts to justify her drug use, and, after a year of treatment, she still was in the "denial" stage of recovery. Thus, the court concluded:
"Clearly, Mother's substance abuse problem is intractable. Treatment is not working. She continues to endanger Child's welfare. She has been arrested and convicted twice, and there is no indication that she has stopped using heroin. Her explanation for her February 2016 arrest, which she testified to at the September hearing, is classic denial.[6 ] She continues to be unable to recognize that associating with heroin addicts, even if the addict is Child's father, gets her into trouble. Mother is willing to do inpatient treatment, but conditioned on Child being placed with her either while in treatment or upon her completion of the inpatient program."
Relatedly, the juvenile court noted mother's apparent unwillingness to separate herself and child from father, her lack of progress in addressing her substance-abuse issues on her own terms, and her failure to recognize and address the psychological or "somatoform" sources of her pain, as Morrell recommended. Individually or together, those circumstances rendered her incapable of caring for child. Moreover, mother had made little or no progress in that regard in the two years that child had been in substitute care. Finally, mother's continued association with father showed a lack of effort to adjust her circumstances to make child's return possible, while her failure to make a lasting adjustment despite DHS's *93 reasonable efforts (with mother, instead, blaming DHS for working against her) made it appear "reasonable that no lasting adjustment can be effected no matter how long the DHS works with Mother." *129 Having found that mother was unfit and that integration into mother's home was improbable within a reasonable time due to conduct or conditions not likely to change, the juvenile court turned to whether DHS had established, by clear and convincing evidence, that termination of mother's parental rights was in the best interests of child. ORS 419B.500. Ultimately, the court concluded that, although DHS had established an urgent need for the security of a permanent home , it had not shown that it was in child's best interests to be freed for adoption. Accordingly, the court concluded that DHS "should consider establishing a permanent guardianship as provided for in ORS 419B.635."[7]
In reaching that conclusion, the juvenile court acknowledged the report and testimony of Dr. MacPhail, whom the court recognized as "an experienced clinical psychologist who specializes in children," and who had evaluated child the month before the termination trial. As the court summarized, MacPhail
"noted that Child has below average social skills and his verbal development is only in the second percentile. She diagnosed him with adjustment disorder with mixed disturbance of emotions and conduct as well as a language disorder. She explained that these are likely the product of neglect and can be overcome with behavioral and language therapy. She testified that Child has a higher level of need than the average child, so permanency is especially urgent. In her opinion, asking Child to wait while Mother completes six months of inpatient treatment followed by six months of settling into a residence and getting stable is too long. Dr. MacPhail acknowledged that Child's behavior and development issues could be genetic in origin, but she discounted the likelihood of this because Child is improving in foster care."
The juvenile court observed, however, that MacPhail had not expressly favored adoption as a means of achieving *130 permanency, and that, in MacPhail's view, a guardianship could very well be appropriate.
The court further found that mother and child "have a bond, despite the limited time they have together and despite the fact that Child has lived with his uncle and aunt for half of his four years."[8] The court specifically appears to have accepted the testimony of child's maternal grandmother that child was excited to see mother during visits, that the two of them played, colored, and read books together, and that child had trouble separating from mother at the end of visits. The court also found that child was close with both of his maternal grandparents.
Thus, even though the juvenile court considered it critical that mother overcome her substance-abuse issues, and found the prognosis for doing so "poor, given Dr. Morrell's evaluation" (as well as mother's ongoing relationship with father), the court concluded that it was in child's best interests to maintain the parent-child relationship. In the court's view, "leaving a door open may be an incentive to Mother." And, because termination, the court reasoned, is for "hopeless cases," it was not appropriate to terminate mother's parental rights while any hope for reunification remained.
III. ANALYSIS
As a preliminary matter, we again note that mother does not contest the juvenile court's determinations that she is presently unfit and that the conduct or conditions that place child at serious risk are unlikely to change. Moreover, having reviewed the record *94 in its entirety, we now make the same determinations, together with the underlying findings of historical fact described in our discussion of the juvenile court's permanency and termination rulings. Having addressed those matters, we turn to the issue disputed on appeal: Whether termination of mother's parental rights is in child's best interests. For the reasons that follow, we conclude on de novo review that it is in child's best interests to terminate mother's parental rights so that child will be freed for adoption. *131 As framed by the parties, the resolution of their dispute turns on whether, under Geist , the finding of the first two predicates for termination gives rise to a presumption that termination is in a child's best interests. DHS points to the Supreme Court's statement in Geist that, "[w]here a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time * * * the best interests of the child(ren) generally will require termination of that parent's parental rights." 310 Or. at 189, 796 P.2d 1193. Thus, DHS argues, in the absence of specific evidence suggesting that termination is not in a child's best interests, that becomes the default outcome. Mother responds that the Supreme Court's statement in Geist is dictum , without precedential value, and that there is no such presumption under Oregon law. In mother's view, such a presumption would unlawfully shift the burden of proof by requiring mother to prove that termination is not in child's best interests. Mother additionally argues that there is no evidence to establish that termination is in child's best interests, and that we should affirm the juvenile court's ruling on that basis.
We conclude that it is not necessary to resolve the issue that the parties identify, because the record contains clear and convincing evidence that it is in child's best interests to terminate mother's parental rights. That is, even assuming that Geist left intact DHS's distinct obligation to establish that termination is in a child's best interests, DHS has satisfied that obligation here. See Dept. of Human Services v. M. P.-P. , 272 Or. App. 502, 504, 356 P.3d 1135 (2015) (discussing a "two-stage analysis," in which the first stage is directed toward the alleged grounds for termination, and the second stage focuses on the best interests of the child; noting that a best interests of the child determination may preclude termination even if the statutory grounds of conditions or circumstances unlikely to change are satisfied). Viewing the evidence under that well-established standard, we are persuaded that, even though it may not be beyond all hope that mother will someday rein in her substance-abuse issues, termination is warranted. More specifically, we conclude that, given child's pressing need for permanency and the harm that appears likely if permanency is further delayed, it is in child's best interests to be freed for adoption *132 now, rather than waiting indefinitely to see whether mother can eventually become a safe parent for child.
In concluding that terminating mother's parental rights is in child's best interests, we begin by noting that the exact circumstances that endangered child's welfare and so brought child under the jurisdiction of the juvenile court in November 2014 remained essentially unchanged at the time of the termination trial nearly two years later. That is, even though mother had, in the intervening time, obtained a substance-abuse assessment and initiated treatment, joined a 12-step group, completed a parenting program, and obtained a comprehensive psychological evaluation that explored and proposed ways to address many of the root causes of her drug addiction, she had made no meaningful progress toward ameliorating the bases for the juvenile court's involvement. Specifically, mother admitted at the outset of the case that her substance abuse interfered with her ability to safely parent child, that she had exposed child to people who possessed drugs and engaged in criminal activity, and that she had failed to maintain a safe environment for child. And, at the termination trial, DHS established that mother continued to use heroin and other opioids, that she had not made any effort to separate herself from father (who continued to actively use drugs), and that DHS had not been permitted to inspect her home to ensure that it had been made safe. As a result, the juvenile court found-and mother does not dispute-that she remained *95 unfit to parent child due to conduct or conditions that were unlikely to change.[9] *133 Moreover, even though the juvenile court's desire to give mother an incentive to succeed is understandable, virtually all of the evidence at trial weighed against the belief that the incentive would be effective. Although child was removed from mother's care largely due to her drug addiction, it took almost a year and the threat of a change in plan before she obtained an initial evaluation. Then, when the juvenile court did change the plan-because mother had not sufficiently progressed and, in fact, had been indicted for possessing heroin-the court offered an additional incentive, emphasizing that "this case is not over." That reminder was again ineffective, as mother's participation in treatment dropped off and her use of drugs continued. And when the treatment director-much like the court-agreed to give mother a "last chance," she failed to take advantage of that opportunity, instead returning to regular heroin use, apparently in an effort to refrain from using painkillers.
In the same vein, Morrell observed that mother gave "heartfelt descriptions suggesting [a] desire for reunification," but suggested that her slow follow-through with services flew "in the face of her heartfelt claims of wanting her child back as soon as possible." Similarly, Morrell noted that her extreme delay in completing her evaluation with him was "even greater evidence that she's in no hurry to have her child back."
In addition to that direct evidence that mother was not sufficiently motivated to address the jurisdictional bases, there also was evidence that she simply could not be successful until she addressed the mental health issues that, at least in part, drove her drug addiction. Morrell, who is himself an expert in chronic pain, deemed mother's complaints of pain to be "highly psychological" rather than medical, as mother insisted. (Emphasis in original.) As a result, he reported that mother required extensive mental health therapy that would help her "recognize the somatoform nature of her symptoms and the need to address psychological symptoms directly rather than attempting to characterize them as medical conditions." And, indeed, following the *134 termination trial, the juvenile court expressly acknowledged that circumstance and that mother would require at least a year and a half to two years of therapy before she could safely care for child-and that would be after she achieved the insight that she continued to resist at the time of trial.
In concluding that it was not in child's best interests to terminate mother's parental rights, the juvenile court remained optimistic that mother could succeed. That optimism, however, was not rooted in any evidence that suggested that mother would follow Morrell's recommendations and address the mental health component of her addiction. Instead, the court evidently believed that mother might be "successful in treating her pain with herbal extracts and medical marijuana, [so that] she may be able to focus on being a parent."[10] The court acknowledged, however, *96 that, even in light of mother's evidence that she had made recent progress in treating her pain in that way, the "prognosis [remained] poor, given Dr. Morrell's evaluation." Based on our review of the evidence, mother's pursuit of alternative treatments for her pain was little more than a speculative basis to believe that she might, over some indeterminate time, gain the capacity to safely parent child.
More significantly, the juvenile court's approach, however well intended, is not appropriately child centered. Cf. Dept. of Human Services v. C. L. , 254 Or. App. 203, 214, 295 P.3d 72 (2012), rev. den. , 353 Or. 445, 300 P.3d 168 (2013) (discussing the "child-centered * * * determination» whether, under ORS 419B.498(2), it is in a child›s best interests not to file a petition for termination). To be sure, the court observed that child appeared to have "a good albeit very limited relationship with Mother." The court also stated that it was "in Child's best interest to maintain the family relationships." But, despite those passing references to child, it is evident that the court's focus was on mother and its desire to see *135 her succeed, rather than the effects that delaying permanency would have on him.[11] From child's perspective, the likelihood of mother being successful, such that their limited bond could grow, is both speculative and remote. As the juvenile court noted, child had been in substitute care half of his life at the time of the termination trial. And, at best, according to Morrell's estimates, it would likely take at least that much longer-or until child was six years of age or older-before child could safely be returned to mother's care. The juvenile court did not consider what emotional, psychological, or other effect that giving mother more time would have on child; the court focused its attention on how its decision could motivate mother.
Turning our focus to child's needs, MacPhail diagnosed him with an Adjustment Disorder with Mixed Disturbance of Emotions and Conduct, based in part on his reported symptoms of emotional reactivity, physical aggression, and temper tantrums. In MacPhail's opinion, those symptoms were "likely at least in part related to the numerous changes and stressors in [child's] life and [were] affecting his overall social-emotional functioning."[12] In MacPhail's opinion,
"[child's] greatest need is probably for stability, permanency and consistent care-giving. [Child] has experienced a great deal of disruption in his life, and he needs a stable home and parent. [Child] would benefit from a parent who is able to offer a high level of consistency, stability, and routine."
MacPhail further opined:
"[Child] has a high need for stability and permanency. We know from research that children are often better able to form secure attachments with new caregivers when a change in placement occurs as early as possible in *136 development. Thus, it would be recommended that a permanent placement be secured as soon as possible[.] * * * Allowing [child] to form a relationship with a permanent caregiver sooner would increase his chances of being able to form a secure, healthy attachment with that caregiver."
(Emphasis added.)
We recognize that, in this case, the proposed guardians were child's uncle and aunt, who already had served as his foster parents for nearly two years at the time of the termination trial and under whose care child continued to improve. That fact evidently informed the juvenile court's decision to encourage DHS to pursue a "permanent" guardianship under ORS 419B.635. Furthermore, *97 because the transition to their care was already well underway, it may have appeared to the court that the urgency of establishing a permanent relationship with them would be less than it might be in other cases, where the relationship with a foster family is only transitory. And, indeed, that appears to be the dissent's rationale as well. See 292 Or. App. at 144, 422 P.3d at 101 (Ortega, J., dissenting) (stating that "child is in a stable placement with his uncle and aunt and, at his young age, is not even aware of the relative impermanence of his current placement").
Respectfully, however, that view-and its implicit conclusion that, on this record, a permanent guardianship is shown to be in child's best interests-is misguided.[13] First, the dissent relies on personal knowledge and other outside information in support of its apparent endorsement of an arrangement that allows child to have continuing contact with mother. See id . at ----, 422 P.3d at ---- (Ortega, J., dissenting). Not only does that view rely on matters that are not part of the record in this case, it also fails to grapple with the potential downside of such arrangements. MacPhail testified that the "ongoing visits" and "state of limbo" associated with impermanent placements can lead to anxiety, particularly if "there's a question of, well, you might be going to live with mom someday[.]"
*137 Second, the dissent's view reads too much into MacPhail's "refus[al] to opine on whether adoption was preferable to another permanent option like permanent guardianship." Id . at 144, 422 P.3d at 101 (Ortega, J., dissenting). For one thing, MacPhail did not refuse to state an opinion because she did not have one; she declined to offer one because she felt it was "not [her] purview to make that type of recommendation." For another thing, MacPhail emphasized that, if child were to have ongoing contact with a parent, that parent would need to be able "to meet his needs and to be supportive of him." And, as of the termination trial, mother was nowhere near able to do so.
Third, because it is apparent to us that the juvenile court viewed the "permanent" guardianship as a potentially temporary arrangement-one that could be set aside if mother were sufficiently motivated-many of the concerns that MacPhail expressed would not be alleviated by making child's foster parents his guardians. That is, the various concerns regarding the stress of uncertainty and the consequences of delaying child's attachment to his permanent caregiver would still be present, but the delay would be in the transition back to mother, rather than to his guardians.[14] MacPhail opined that, in the approximately two years that child had been in the care of his uncle and aunt, he had "developed a very secure bond, particularly with his [uncle]." MacPhail explained that once that happens, a subsequent move to another caregiver can be extremely disruptive and stressful, and that the child's reaction to being separated from the foster parent can be quite traumatic. We recognize that there is likely some risk of that phenomenon occurring every time that a child rejoins his or her parents following a temporary placement; the question here, however, is whether, given child's already lengthy removal from his mother's care-together with the likelihood of an equal amount of future delay-it is in his best interests to leave open the possibility of a return to mother. We conclude that it is not.
Finally, while we leave for another day the question whether, in the absence of evidence that termination will *138 adversely affect a child, the juvenile court must free the child for adoption, we observe that our conclusion that termination of mother's parental rights is in child's best interests appears to be consistent with legislative intent. That is, the *98 juvenile code expresses a legislative preference that children be placed in the most permanent setting suitable to their needs. See Dept. of Human Services v. S. J. M. , 283 Or. App. 367, 391, 388 P.3d 417, rev. allowed , 361 Or. 350, 393 P.3d 1175 (2017) (recognizing that preference). Here, even though it is apparent that the court's proposed establishment of a guardianship would provide some degree of permanency to child and potentially address a number of the concerns raised by MacPhail and others, that placement is not the most permanent placement suitable to child's circumstances. Because child's foster parents are, to everyone's understanding, an appropriate adoptive resource, and, unlike a "permanent" guardianship, placement with them for adoption would alleviate all of the uncertainties attendant to any temporary placement, no matter how durable that placement may appear, adoption is the most permanent placement suitable to child.
To summarize, as to the only disputed issue on appeal, DHS has shown by clear and convincing evidence that termination of mother's parental rights is in child's best interests. Specifically, child has a pressing need for permanency that, to all appearances, would be satisfied in relatively short order if he were to be freed for adoption. MacPhail's testimony established a nexus between the disruptions in child's life to date and the emotional and developmental issues he is now experiencing. We recognize that naming child's foster parents as his guardians may to some extent mitigate the effects of those past disruptions. We consider it more significant, however, that leaving open the possibility of a return to mother creates its own instability, and that the less-permanent option of guardianship that mother urges us to adopt exposes child to an unjustifiable risk of future turmoil and disruption in the event that mother someday seeks reunification.
IV. CONCLUSION
In light of the foregoing and our review of the record, we make the same findings of fact that the juvenile *139 court made, and likewise conclude that mother is unfit to parent child due to conduct or conditions seriously detrimental to child. We further agree that integration of child into mother's home is unlikely to occur within a reasonable time, because the conduct or conditions are not likely to change. Unlike the juvenile court, however, we conclude that termination of mother's parental rights so that child is freed for adoption is in the best interests of child.
Reversed and remanded.

Father has voluntarily relinquished his parental rights to child and is not a party to this appeal. However, his circumstances and role in mother's and child's lives throughout the relevant time frame were significant to the juvenile court's rulings following the permanency hearing and the termination trial.

Father did not contest the proposed change of plan to adoption.

The record disclosed that mother gave varying accounts and explanations regarding her use of heroin and related substances, including her reliance on heroin to address back pain resulting from a back injury she had suffered at age 16. Among other things, the juvenile court noted that the evidence included mother's self-report that she had first used heroin at age 13, before her back injury.

There was also testimony from treatment providers that having an active drug user in the household placed mother at risk for relapse, as the other person's use could trigger mother's own addiction.

The parties stipulated that the record of the permanency hearing would be made part of the record for the termination trial. The judge hearing the termination trial, who was not the judge who held the permanency hearing, agreed to listen to the permanency proceedings before issuing a decision, but indicated that he would not rely on the letter opinion issued by the first judge in his own ruling.

Mother's explanation for her heroin arrest had been that she had hurriedly borrowed father's backpack, which, unknown to both of them, contained father's heroin. Father backed mother's explanation that the heroin leading to her conviction belonged to him.

The juvenile court observed that a parent cannot overturn a "permanent" guardianship, citing ORS 419B.368(7). Given the court's other observations, however, it is apparent to us that the court contemplated that, if a "permanent" guardianship were to be established, an authorized party would at some point initiate a return to mother should she eventually be able to safely parent child. See ORS 419B.368 (authorizing juvenile court to vacate a guardianship established under ORS 419B.365 either on its own motion or on the motion of a party other than a parent).

Following the establishment of juvenile court jurisdiction, DHS placed child in relative foster care with mother's half-brother and sister-in-law.

The dissent acknowledges that we have properly identified the task before us-to determine, on de novo review, whether DHS has satisfied its burden of proving, by clear and convincing evidence, that it is in child's best interests to terminate mother's parental rights. 292 Or. App. at ----, 422 P.3d at ---- (Ortega, J., dissenting). The dissent argues, however, that, although we conclude that it is unnecessary to decide whether the Supreme Court's decision in Geist gives rise to a presumption in this case, we effectively apply one here "by conflating the best interests inquiry with the inquiry regarding unfitness and integration within a reasonable time." Id. at 139-40, 422 P.3d at 98 (Ortega, J., dissenting); id. at 144, 422 P.3d at 101 (Ortega, J., dissenting) (stating that the majority opinion "concentrat[es] its analysis entirely on the evidence that established mother's unfitness"). We respectfully disagree. While we do summarize many details related to mother's circumstances and the likelihood that they could change, we do so primarily for their relevance to the question whether leaving open the possibility of an eventual return to mother's care-as mother clearly hoped for and the juvenile court appears to have envisioned-is an appropriate reason for us to conclude that termination is not in child's best interests. In our view, it is not.

Mother and various treatment providers testified throughout the proceedings regarding mother's efforts to address her pain, in part, through the use of various herbal extracts and medical marijuana. Although some extracts could potentially result in false positives in drug and alcohol screenings, mother's providers did not, as a general matter, view her use of the extracts to treat her pain as problematic, so long as her use was sanctioned by her doctor. The same was true as to medical marijuana.

Because the juvenile court rejected termination in favor of urging DHS to pursue a permanent guardianship, the court may not have viewed its decision as causing any further delay in permanency. We address that potential rationale below.

Child also exhibited "a significant delay in his acquisition of language skills, particularly in expressive language, which impairs his functioning in a number of areas, including communication, social participation, and academic achievement." According to MacPhail, those symptoms meet the criteria for a language disorder.

We characterize that conclusion as merely implicit because, even though the dissent concludes that termination is not in child's best interests, it steers clear of concluding that a guardianship is in child's best interests and simply suggests that a guardianship under ORS 419.365 could provide a satisfactory degree of permanency for child. 292 Or. App. at ----, 422 P.3d at ---- (Ortega, J., dissenting).

We note that, as of the termination trial, DHS also viewed child's maternal grandparents as a potential adoptive resource. Nothing about that possibility of yet another transition for child would tend to alleviate those concerns.