DEHOOG, J.
*515 Mother appeals a judgment terminating her parental rights to her two-year-old daughter, K, the youngest of mother's nine minor children, none of whom were in her care at the time of the termination trial.[1] In eight assignments of error, mother contends that the juvenile court erred in determining that she was unfit to parent K due to conduct or conditions seriously detrimental to K, and in concluding that it would be in K's best interests to terminate mother's parental rights. On de novo review, we conclude that the evidence is clear and convincing that mother is not fit to parent K and that reintegration into mother's care within a reasonable time is improbable because the conduct or conditions that cause her to be unfit are unlikely to change. We further conclude that the Department of Human Services (DHS) has established that termination of mother's parental rights is in K's best interests. Accordingly, we affirm.
LEGAL STANDARDS
Under ORS 419B.500 to 419B.504, a juvenile court may not terminate a parent's rights to a child on the basis of unfitness unless it determines, by clear and convincing evidence, that the parent has engaged in conduct or is characterized by a condition seriously detrimental to the child and that reintegration into the parent's care within a reasonable time is improbable because the *345 harmful conduct or condition is unlikely to change. State ex rel SOSCF v. Stillman , 333 Or. 135, 145-46, 36 P.3d 490 (2001). Further, even if DHS satisfies its burden of proving those statutory grounds, the court may not terminate a parent's rights unless clear and convincing evidence also establishes that termination is in the child's best interests. ORS 419B.500 ; *516 Stillman , 333 Or. at 144, 36 P.3d 490. "Evidence is clear and convincing when it makes the existence of a fact highly probable or when it is of extraordinary persuasiveness." Dept. of Human Services v. R. K. , 271 Or. App. 83, 88, 351 P.3d 68, rev. den. , 357 Or. 640, 360 P.3d 523 (2015) (internal quotation marks omitted).
We review a judgment terminating parental rights de novo . ORS 19.415(3)(a) (requiring the Court of Appeals to "try the cause anew upon the record"). As we have explained, however, "[i]n reviewing de novo a judgment terminating parental rights," we give "considerable weight to the findings of the trial judge who had the opportunity to observe the witnesses and their demeanor in evaluating the credibility of their testimony." R. K. , 271 Or. App. at 89, 351 P.3d 68 (internal quotation marks omitted). We proceed with those standards in mind.
FACTUAL AND PROCEDURAL HISTORY
DHS's involvement with K dates back to just after her birth on October 7, 2015. Mother's history with DHS, on the other hand, is far more extensive and lengthy, dating back to at least 2003, less than a year after the birth of mother's second child, J.[2] Mother's relationships with the three men who fathered her first eight children were characterized by domestic violence, and her response to that conduct-together with her response to domestic violence perpetrated against her by K's father, RP-are at the center of DHS's efforts to terminate her parental rights. Notably, as to each of the first three fathers-JV, TB, and SR-D-mother found it necessary on one or more occasions to obtain restraining orders to protect herself and her children. Yet, despite mother's evident awareness of the threats that those individuals presented-and, in some instances, despite directives from the juvenile court and DHS to avoid contact with them-mother continued to allow them to have contact with her and with her children, often with harmful consequences.
Mother's struggle with that cycle of violence persisted when K was born. At that time, six of mother's children were *517 under the jurisdiction of the juvenile court, and only the youngest, TB's child H, was returned to her care following K's birth. DHS had previously removed all four of TB's children-L, M, T, and H-from mother's home in early 2014.[3] After taking jurisdiction based on mother's admission that she had chronically failed to maintain a safe environment for her children by allowing them to reside in an unsafe and unsanitary home,[4] the juvenile court ordered mother to participate in various services and returned all four children to her care. The court ordered mother to complete a psychological evaluation and any recommended services, to participate in parenting training, and to maintain safe and stable housing, all as approved by DHS. Finally, the *346 court ordered that TB only be allowed contact with his children as authorized or supervised by DHS.
Although mother participated in some services, her efforts were ultimately insufficient and, by March 2015, the children remaining in her care-TB's four children-had all once again been removed from her home. DHS filed new petitions as to those four, this time alleging, among other things, that mother lacked the skills to safely parent her children and was unable or unwilling to meet their behavioral and psychological needs. DHS further alleged that TB had exhibited a "pattern of violence and/or domestic violence" that represented a threat to his children. In May 2015, the juvenile court again asserted jurisdiction over each of the children, based on their parents' admissions to those and other allegations.
This time, however, the juvenile court did not immediately return any children to mother's care. Concurrently *518 with its assertion of jurisdiction under the new petitions, the court made permanency findings with regard to the earlier petitions. It found that, although mother had participated in some services, she had "not demonstrated any meaningful change or ability to implement skills and knowledge imparted during her participation in services." The court found that mother tended to focus on her own needs to the detriment of her children, and that she lacked "insight as to how her conduct and care of [each] child impacted the child's development and is related to the child's current behavior." In light of those findings, and even though the juvenile court remained optimistic that reunification could be possible within a reasonable time, it ordered that L, M, T, and H be temporarily placed in nonrelative foster care.
Thus, K was born into a family under the jurisdiction of the juvenile court, to a mother who had borne multiple children with each of three abusive partners, and to a father, RP, who had his own pending dependency matters in which he had admitted "engag[ing] in volatile, erratic behavior that causes [his other children] fear." As a result, shortly after K was born, DHS filed the dependency petition in this case, alleging, among other things, (4A) "mother has a pattern of engaging in abusive relationships that pose a threat of harm to her child" and "[d]espite prior services her circumstances have not been ameliorated"; (4B) "mother has other children out of her care that she is not parenting, [and] her circumstances and behaviors have not changed"; (4C) "mother's mental health interferes with her ability to safely parent the child"; (4D) "father's substance abuse interferes with his ability to safely parent the child"; and (4E) "father's violent and erratic behaviors pose a threat of harm to the child."
At the ensuing jurisdictional hearing, mother admitted to allegations 4A and 4C, while father admitted to allegations 4D and 4E. K, whom DHS had not removed from mother's care, was formally placed at home with her. As before, the court ordered mother to participate in services, including parent-child therapy, ISRS[5] services with a *519 demonstration of skills learned, and domestic violence counseling with a DHS-approved provider and the demonstration of a violence-free "lifestyle." And, as with TB, and due to RP's own history of violence and related allegations in his other dependency cases, the court ordered that he not have contact with K except as authorized or supervised by DHS.
For several months after K was born, K was the only child in mother's care. In a permanency hearing regarding the other children held shortly before K's birth, the juvenile court recognized that mother had participated in additional services, including a parenting class she initially had been reluctant to attend. Both DHS and the court were concerned, however, about mother's relatively new relationship with RP and its "recent volatility." The court also observed that mother's comments at the time reflected a "continuing lack of insight into the circumstances and conditions" that had caused her children to come under the juvenile court's jurisdiction. In a hearing following K's birth, however, the court acknowledged mother's progress and her apparently appropriate in-home *347 care for K. Thus, even though the court did not consider it possible at that time for any of the other children to return home, H was ultimately returned to mother's care for a trial reunification in late February 2016, when K was approximately five months old.
That trial reunification-as well as K's entire time in mother's care-was ultimately short lived, again largely due to domestic violence. In March 2016, police responded to a 9-1-1 call from mother. Upon arriving, they spoke with mother, who was "covered in blood." Although the primary officer on the scene quickly determined that it was not mother's blood and that no one had been assaulted, he testified that it "looked like a murder scene," with "blood all over [mother], all the walls, the floor. There was almost not a surface not covered." Mother explained that RP had come over uninvited and that, after she had refused to allow him in, he had broken a window and forced himself in, cutting himself in the process. According to the officer, H and K were in a bedroom when he arrived, and there was no blood on them or in that room. H, however, "appeared quite traumatized. She was wrapped up in a blanket on a bed, you know, hiding, cowering. You know, appeared scared." Mother testified *520 that H and K had been asleep the whole time that RP was in the house, but also said that she had locked herself in the bedroom with them and barricaded the door with a bed until he left, at which point H woke up.[6]
Substantially due to that incident, DHS determined that an in-home placement was no longer safe for H or K. Notably, even though mother denied having ongoing contact with RP at the time of the March 2016 incident, RP told a DHS supervisor that "he had been continually staying there on occasion, but leaving during the day, because he knew he wasn't supposed to be there[.]" Moreover, mother acknowledged at trial that, even though DHS had told her in late 2014 that RP was not safe, she still allowed him to have contact with her and her children. That contact continued despite mother's participation in domestic violence services through a program called "Womenspace," and despite an incident in December 2015, during which RP charged up to mother as she was pushing K in a stroller and tried to pull the stroller away.[7] The contact also continued even though a restraining order issued following the stroller incident prohibiting RP from contacting mother; in fact, mother had regular contact with RP even while he was in jail as a result of the March 2016 incident.
The ultimate factor in DHS's decision to remove H and K from mother's care was her inability to formulate an in-home safety plan for her children. Pending RP's release from jail, DHS had helped mother get into a safe house through Womenspace. However, when that program terminated mother's services because she was not actively participating, DHS confronted her with her ongoing relationship with RP, and informed her that, to keep her children in her *521 home, she would need to help DHS come up with a sustainable plan. As DHS later explained at the termination trial, mother had participated in a number of parenting classes, yet, even though she could at times articulate some of the skills she had been taught, she evidently remained either unwilling or incapable of "actually parent[ing]." Accordingly, in April 2016, DHS removed both children from mother's care-K for the first time, and H for the third; both have resided in foster care since that time.
Between the March 2016 incident and the April 2016 removal of H and K, the juvenile court held a permanency hearing regarding *348 mother's other children. At that time, the court noted the recent incident involving RP,[8] and expressed its concern that mother appeared to be incapable of safely parenting more than the two children then in her care. Because, however, DHS had asked the court for additional time to allow mother "to participate in services and to further evaluate safety issues related to the incident with the break in," the juvenile court did not change the plan for any child at that hearing. In addition to continuing with her previously ordered services, the court ordered mother to obtain an updated psychological examination, to participate in and complete the "Circle of Security" program,[9] and to participate in both individual therapy and therapeutic services recommended for her children.
As noted, DHS subsequently removed H and K from mother's care in April 2016, and, in August 2016, the juvenile court held a permanency hearing regarding K. The court determined that, despite DHS's reasonable efforts within the relevant time frame to reunify the family, mother had *522 not made sufficient progress toward ameliorating the bases of jurisdiction and K could not safely be returned to mother's care. The court further concluded that further efforts would not make it possible for K to return home within a reasonable period of time, and that none of the circumstances under ORS 419B.498(2) for not proceeding with the termination of mother's parental rights to K were present. In making those determinations, the court explained:
"DHS has been working with Mother for an extended period of time. This child was conceived while her others were in substitute care or placed with a father. At the time (and currently), this child's father had other children in substitute care. This is mother's ninth child. She has not been able to maintain a safe environment for this child. She has been dishonest about her relationship with Father. The child's siblings have been in substitute care for 18 months without any meaningful progress. Throughout the case she has demonstrated a lack of insight as to how her conduct and care of her child impacted her child's (and siblings') development and how that relates to the siblings' behavior. None of her children are placed in her care."
Accordingly, the juvenile court changed K's plan to adoption and directed DHS to file a petition to terminate mother's rights no later than October 31, 2016, with K being placed for adoption no later than October 31, 2017. Mother did not appeal the resulting permanency judgment.
In November 2016, DHS filed a petition to terminate mother's parental rights, leading to a termination trial held in late September 2017. The court heard testimony from numerous witnesses, including mother, RP, law enforcement, various treatment providers, and DHS caseworkers and supervisors; the court also received extensive documentary evidence. Among the written materials provided to the court were psychological evaluations regarding K and each of TB's four children, three psychological evaluations of mother, and a permanency assessment regarding K.[10] Because those materials and the associated testimony are important to our ultimate conclusion in this case, we set forth their content in some detail.
*523 Psychologist Glenna Giesick, Ph.D., conducted extensive psychological evaluations of L, M, T, and H in May and June 2017, followed by a "Developmental Screening & Needs Assessment" of K in August 2017, *349 approximately six weeks before the termination trial. In addition to providing a descriptive diagnosis-"neglect of a child"-for each of TB's four children, Dr. Giesick also provided formal psychological diagnoses.[11] Giesick gave M and T the most serious diagnoses, with both those children being diagnosed with post-traumatic stress disorder (PTSD), M also being diagnosed to have an adjustment disorder with disturbance in conduct, and T also being diagnosed with attention-deficit hyperactivity disorder (ADHD), possibly secondary to PTSD, as well as oppositional-defiant disorder. Giesick's primary diagnosis of L, the eldest of TB's children who was 12 years old at the time, was oppositional-defiant disorder. Notably, L's behavior was arguably the most severe of the four at the time of his removal from mother's care in January 2015;[12] by the time of the 2017 assessment, however, L had been in foster care for nearly two-and-a-half years and had improved measurably in every way. Finally as to those four, Giesick diagnosed the youngest, H, who was six-and-a-half years old at the time, with only a provisional adjustment disorder with mixed disturbance of emotions and conduct, a substantial improvement from the oppositional-defiant disorder diagnosis that she qualified for in 2015, before her extended placement in foster care.
Giesick noted that each of those four children had experienced a great deal of trauma given their age, as well as neglect (given, among other things, that their home routinely fell below community standards) and possible exposure to *524 domestic violence. With the possible exception of T's ADHD-which Giesick acknowledged could be biological in origin-Giesick appears to have attributed their behavioral and emotional issues to their "chaotic" and unregulated environment while living under mother's care. Consistent with that assessment, Giesick testified that all four appeared to have measurably improved since her earlier evaluations in 2015, most likely due to the relative stability of their foster-care placements and the absence of chaos in their lives.
Unlike Giesick's evaluations of the four older children, DHS specifically asked Giesick to contemplate reunification for K, that is, to assess the likely effect of reuniting K with one of her parents under circumstances in which that parent returned to the conduct or conditions that had led to K's removal. DHS asked Giesick to factor into that assessment her evaluations of the other four children. DHS also asked whether, given K's history, diagnosis, and developmental and attachment needs, it would be reasonable to make K wait in foster care while her parents addressed their conduct or conditions and, if so, for how long. Finally, Giesick was asked whether, in her professional opinion, adoption or some other plan would be in K's best interests.
After taking into consideration the various circumstances highlighted above, including mother's pattern of involvement in abusive relationships and her lengthy and ongoing struggles to meet the needs of her children, Giesick opined that returning K to that environment would place her "at risk for developing a mental health condition or behavioral concerns." Giesick based that opinion, in part, on her belief that "[e]xposure to domestic violence and the instability of placement in and out of foster care has most assuredly led to the [other] four children having mental health and behavioral concerns."
Giesick observed that, 16 months into her foster-care placement, K was a "happy and healthy toddler," that she did not meet the diagnostic criteria for any major mental illness or behavioral disorder, and that K's primary attachment figure was her foster mother. Giesick did not offer an *525 opinion as *350 to whether K was attached to mother.[13] Giesick believed it was not reasonable for K to wait any longer for her parents to adjust their conditions and circumstances; given that mother, specifically, had "historically not been able to maintain positive changes in a manner that ha[d] benefited her other children, it seem[ed] counter-productive to expose a well-developing toddler to the stress and instability" that reunification would likely entail.
Finally, it was Giesick's opinion that being placed for adoption now is in K's best interests. In both her written report and her testimony, Giesick expressed the view that K needed to develop permanency and a sense of "familial security" as soon as possible, so as to minimize the risk of impairing her psychological, interpersonal, and academic development. According to Giesick, the optimal time to plan for K's future and place her for adoption is now. Although Giesick further explained in her testimony that the optimal age for making that transition is between ages zero and five years-and that K is squarely within that range-the sooner K can transition to her permanent caregiver, the more likely she is to develop appropriate attachments.
DHS presented similar testimony and a written report from Lee Anne Wichmann, a licensed marital and family therapist hired by DHS to evaluate K's permanency needs. Like Giesick, Wichmann advocated permanency "as soon as possible." She acknowledged that mother had been "able to demonstrate some effective parenting skills in a supervised visit setting," but noted that there was no evidence that mother could sustain that in a home setting, without DHS involvement and supervision. Further, based on her meeting with mother and her review of mother's history with DHS, she expressed considerable doubt that mother could demonstrate the ability to safely parent K, and certainly not within a reasonable time frame given K's developmental needs. Wichmann did acknowledge that, if any child could wait for a parent to adjust his or her circumstances without *526 suffering adverse consequences, that would be K, because she was healthy, had no apparent attachment issues, and was developmentally on track. Nonetheless, Wichmann adhered to her view that K should not be made to wait. As Wichmann explained, the longer K stayed in foster care-even a foster home in which she was thriving-the greater the risk she would face of developing attachment issues and other difficulties.
In addition to that psychological evidence regarding the children, DHS presented three psychological evaluations of mother. First, in July 2014, psychologist Ryan Scott, Ph.D., completed a comprehensive examination at the request of DHS, seeking to determine not only whether mother suffered from a mental disorder, but also her service needs, her ability to meet the needs of her children, and her prognosis for change. A year later, in July 2015, David Truhn, Psy.D., conducted another comprehensive psychological evaluation of mother, as well as a parenting assessment, again at DHS's request. Finally, in June 2017, shortly before the termination trial, Truhn once again, at DHS's request, conducted a comprehensive psychological evaluation and parenting assessment of mother. Each report discusses mother's extensive history with DHS relating to neglect, below-community-standards living conditions, and her children's special needs, which included severe behavioral issues at home and at school. Each report also notes mother's history as a victim of physical and emotional abuse by her domestic partners, including RP. And each report acknowledges that mother has participated in extensive services for herself and her children, including "numerous parenting classes, domestic violence classes, parent training and in-home support services," as well as individual counseling and therapy.
Several aspects of those reports are particularly noteworthy. For example, in his 2014 assessment, Scott notes that mother "appears to be following through on the services that are asked of her and receiving positive *351 reviews from services providers"; Scott also observes that she "has already begun to make changes" and "appears to be more motivated for and engaged in treatment." Thus, though seemingly guarded, Scott's prognosis for mother's ability to *527 address her circumstances was "good," provided that she continued to meaningfully follow through with treatment and that she "demonstrate the ability to make healthy relationship choices in not exposing her children to potentially dangerous individuals[.]"
The following year, Truhn was less optimistic. By then, DHS had returned L, M, T, and H to mother's care, only to again remove them, evidently due to mother's failure to follow through with the services that Scott had found her motivated to complete.[14] Truhn's report observes that the children's behaviors improved following their removal; he acknowledges, however, that, after that most recent removal of her children, mother also resumed therapy and parenting classes and ended her relationship with RP. Truhn also notes that, when confronted with reports that, before her children were removed, she had not been following through with her parenting training or applying the discipline techniques that she had learned, mother responded by telling Truhn that she thought she had been following through with her training and doing "everything they wanted." She admitted, however, that she had learned much more since resuming her parenting class and said that she wanted to attend the Circle of Security program again.[15]
Truhn diagnosed mother with dependent personality disorder, based largely on mother's explanation that her fear of being alone was what caused her to stay in abusive relationships that she knew presented a threat to her and her children. Truhn also diagnosed mother with panic disorder. Truhn opined that mother's dependent personality caused her to engage with her abusers while failing to impose appropriate boundaries; that pattern had repeatedly placed mother and her children in dangerous and vulnerable situations. Moreover, given that pattern, Truhn believed that, if mother did not have continuing external support and motivation from DHS and the court, it would not matter *528 whether mother had one, two, six, or eight children in her care. Truhn further believed that mother would need that ongoing support for an extended period of time, because without it she would continue failing to follow through as "a way to self-sabotage and gain more attention from service providers." Thus, even though Truhn, like Scott, recognized that mother had the intellectual capacity to understand her training, he considered her prognosis for change to be poor, given her demonstrated inability to follow through with that training.
In June 2017, when Truhn again conducted a comprehensive assessment of mother, she had a new child, K, who by then was 19 months old and had been in foster care for over a year. Mother told Truhn about her on-again, off-again relationship with K's father, RP, who was serving a 14-month prison sentence at that time. Mother said that she did not want to take RP back following his release from prison. She acknowledged, however, that, despite RP's history of domestic violence, drug abuse, and frightening behavior around her children, she had repeatedly allowed him back into the relationship. That pattern included having RP move back "right away" after H and K were removed from her care, when she "went and found him because [she] felt alone and scared and lost everything."
Truhn acknowledged mother's report that she was engaged in a variety of services, including weekly Womenspace sessions, a parenting group, and weekly individual therapy appointments at Options with Rachel Dyer, whom mother had been seeing for a year. Truhn also reviewed Dyer's counseling records, which, as to mother's most recent session, reflected that she had been an active participant who "remained engaged in the *352 session while exploring aspects of self-care that she can practice[.]"
Notwithstanding mother's efforts, however, Truhn's conclusions were largely the same as two years before. Mother's primary diagnosis remained dependent personality disorder, with persistent depressive disorder and dependent personality disorder with antisocial features to be ruled out. Central to Truhn's diagnosis was mother's pattern of returning to abusive relationships and the reasons that *529 she gave for doing so. Truhn concluded that "the symptoms primarily associated with [mother's] dependent personality disorder are the primary symptoms that are affecting her ability to provide a consistent safe and stable environment for her children." Truhn contrasted mother's intellectual and cognitive capacity to understand her children's basic needs with her ongoing struggle to recognize and fulfill her parental responsibilities. Truhn noted mother's difficulty understanding such concepts as the role a parent's encouragement plays in a child's development, and he emphasized mother's continued engagement with abusive partners despite her apparent awareness that domestic violence can affect children; particularly noteworthy to Truhn was that mother did not even seem to recognize that her association with those individuals could place her children in actual danger.
Given those observations, as well as mother's minimal progress in the two years since her last evaluation, Truhn stated that the timetable for mother to "make any significant, lasting changes in her patterns is considered to be over one year." Overall, Truhn concluded once again that mother's "prognosis for change is poor. She lacks insight into dependent personality disorder and is not receiving treatment for that."
After receiving all of the evidence described above-as well as considerably more evidence not described-the juvenile court concluded that DHS had established, by clear and convincing evidence, that mother was unfit to parent K, and that reintegration into mother's care within a reasonable time was improbable because the conduct or conditions that caused her to be unfit were unlikely to change within a reasonable period of time.[16] The court further concluded that *530 it was in K's best interests that mother's parental rights be terminated and that K be freed for adoption. The court gave no explanation for any of its findings or conclusions, either in its letter opinion or in the judgment. This appeal followed.
ANALYSIS
On appeal, mother contends that the juvenile court erred in concluding that DHS had proved, by clear and convincing evidence, its allegations of statutory grounds to terminate mother's parental rights and that it was in K's best interests to do so. Mother specifically argues that, because the evidence showed that at the time of the termination trial she was engaged in appropriate services, she had not had contact with RP for six months, and she said that she had no plans of reuniting with him, DHS's evidence that mother had mental health issues and was a victim of domestic violence was insufficient to establish that she was an unfit parent under ORS 419B.504. And, as to the juvenile court's determination that it was in K's best interests to terminate mother's parental rights, mother argues that, because there was evidence that she and K are bonded, that her supervised visits with K went well, and that discontinuing visitation-which could not be guaranteed if K were adopted-might be detrimental to K, the court's best interests determination also was in error.
*353 In response, DHS argues that, even though the evidence showed that mother had made some improvements, she had not made sufficient progress by the time of the termination trial to demonstrate that she was no longer unfit in any of the ways alleged in the petition; DHS further notes that mother has not argued that, to the extent that DHS has proved the specific allegations of the petition, it has not established that reintegration into mother's home within a reasonable time is improbable because the conduct or conditions that render mother unfit are not likely to change. As for whether it is in K's best interests to terminate mother's parental rights, DHS points out that K has been in foster care most of her life, that the evidence showed that, for various reasons, K needs permanency now, and that, contrary to mother's argument, the evidence did not reflect that mother and K have such a strong bond that any detrimental effect *531 of terminating mother's parental rights would outweigh the benefits of freeing K for adoption.
Mother's first argument requires relatively little discussion. The evidence established far more than just that mother has a dependent personality disorder and that she has been the victim of domestic violence. Mother has spent virtually her entire adulthood in relationships with abusive men. As Truhn explained, mother's pattern-forming relationships, ending them due to abuse, and then repeatedly reuniting with her abusers despite her awareness that she was exposing her children to a substantial risk of direct and indirect harm-is symptomatic of her disorder. Truhn first made that observation in 2015, early in mother's participation in court-ordered services, and again near the time of trial, after mother had spent at least two years receiving the services that she now suggests have rendered her a fit parent.
In Truhn's view, mother had made little or no progress in addressing that dangerous pattern by the time of trial, in part because the services she was receiving were not directed at her dependent personality disorder.[17] Moreover, mother had repeatedly assured others that she understood the need to avoid her abusers for her own safety and for the well-being of her children, only to continue contacting them behind the backs of her treatment providers and DHS caseworkers. In light of that evidence, as well as evidence that mother had repeatedly lied about those contacts, the juvenile court was not required to accept her testimony that she would not resume her relationship with RP upon his release from prison.[18] Even without deferring to the court's implicit determination that mother's assurances were not credible, the evidence is clear and convincing that mother continues to suffer from a mental illness that impairs her ability to *532 safely parent K and that exposes K to the risks and detrimental consequences of domestic violence.
That same evidence demonstrates that, despite DHS's reasonable and protracted efforts to provide mother with appropriate services, she has not effected a lasting adjustment in the circumstances seriously detrimental to K, nor does a lasting adjustment appear possible. Even if future treatment specifically directed at mother's mental health issues could effect a lasting adjustment in that circumstance, there is little or no reason to believe that she can overcome her other parenting deficiencies. We recognize that, in addition to the evidence discussed above, the juvenile court heard testimony and received exhibits indicating that mother actively participated-at least at times-in various parenting programs, and that she often was able to articulate what she had learned as a result. However, as Truhn explained in his 2017 evaluation-and as the testimony of various DHS caseworkers and treatment providers corroborated-mother continued to lack a genuine understanding *354 of her parenting role and appeared unable to implement what she had learned without supervision. And, even though there was some evidence that mother had brought her home up to minimal community standards, thereby addressing one of the concerns that first brought her children into care, the balance of the evidence supported the finding that mother still lacked the parenting and other skills necessary to maintain both a suitable living situation and a safe and stable home for K. Finally, mother points to no evidence showing that she had a viable plan for the return of her child, nor does the record disclose such evidence.
On de novo review, and based on the foregoing and other evidence presented at trial, we conclude that there is clear and convincing evidence that, for each of the reasons that the juvenile court relied on, mother is unfit; we further conclude that K cannot be reunited with mother within a reasonable time because those circumstances are unlikely to change. Accordingly, we reject mother's first six assignments of error.
Turning to mother's final two assignments of error, she contends that there is insufficient evidence to support *533 the conclusion that terminating her parental rights is in K's best interests and that, therefore, the juvenile court erred in terminating those rights. As we will explain, we conclude otherwise: The evidence presented at trial clearly and convincingly establishes that terminating mother's parental rights is in K's best interests.
We emphasize at the outset that our determination of a child's best interests is necessarily a child-centered inquiry. See Dept. of Human Services v. T. M. D. , 292 Or. App. 119, 134, 423 P.3d 88, rev. allowed , 363 Or. 677, 427 P.3d 1087 (2018) (requiring best-interests inquiry at termination stage to focus on specific needs of child rather than qualifications of parent). Thus, it is not enough for us simply to observe that mother's parenting deficits have directly led to lasting consequences for at least four-and as many as eight-of her other children and that we should not allow K to suffer the same fate.[19] Rather, we must determine whether clear and convincing evidence relevant to K's circumstances supports the conclusion that it is in her best interests to be freed for adoption. Similarly, merely having a professional testify that, in his or her opinion, a particular child "needs permanency now" is not a sufficient basis on which to draw that conclusion. We cannot conceive of a professional testifying as to any child that permanency is not important to the child's development, nor that permanency sooner is not better than permanency later. As a result, an undifferentiated assertion that a given child requires permanency as soon as possible provides no child-specific information; it therefore will not satisfy DHS's burden to prove that termination is in a particular child's best interests. With those principles in mind, we consider what, in our view, is in K's best interests.
We start by examining the reasons mother asserts that terminating her parental rights is not in K's best interests. Relying on our decision in Dept. of Human Services v. M.P.-P. , 272 Or. App. 502, 356 P.3d 1135 (2015), mother points *534 to evidence that K was bonded to mother, that mother's visits with K went well, and that there would be no way to ensure that visitation would not discontinue following K's adoption, which would be to her detriment. Even assuming, however, that such circumstances could sometimes preclude the determination that adoption is in a child's best interests, we disagree with mother's suggestion that they do so here.
In M.P.-P. , the child was almost 10 years old at the time of the termination trial and had told Giesick-the same psychologist who evaluated K-that his mother was "the 'most important person in the world.' " 272 Or. App. at 503, 505, 356 P.3d 1135. A permanency caseworker, Landin, testified that the *355 child's "eyes would light up" when discussing his mother, and that, while in foster care, the child would cry and leave Landin repeated voicemails saying "I want my mom." Id. at 505, 356 P.3d 1135. Landin also described the mother's visits with her son as demonstrating "a 'positive' and 'nurturing relationship' between [the] mother and [her child]." Id. Based on that evidence and our review of the record, we found there to be "overwhelming evidence regarding [the child's] strong attachment to [his] mother[.]" Id. at 504, 356 P.3d 1135. That, combined with testimony from Giesick that termination could cause the child to mourn his loss in an extended manner, impairing his ability to attach to a new family, led us to conclude that the evidence was not clear and convincing that termination was in the child's best interests. Id. at 504-05, 356 P.3d 1135. Instead, an arrangement that would accommodate a continuing relationship with his mother was clearly within that child's best interests. Id. at 504, 356 P.3d 1135.
Here, in contrast, the evidence of K's bond with mother is substantially more limited than that present in M.P.-P. We recognize that mother was consistent and appropriate in her supervised visits with K, and that she was attentive to K's welfare and safety in those visits. Further, based on observations between the time of K's removal in April 2016 and January 2017, eight months before the termination trial, a DHS visitation supervisor testified that, in her opinion, "[t]heir bond is strong" and growing stronger, and that their attachment is loving. Her opinion, however, that it would upset K if the visits were to end, was based primarily on a general view of how any child would respond *535 under the circumstances, rather than on anything specific to K.
Similarly, although Giesick acknowledged under cross-examination that severing a parent-child attachment can have "dramatic and long-lasting" consequences and therefore should be avoided when possible, Giesick did not indicate that severing mother's ties to K would tend to have that result.[20] Thus, like the visitation supervisor's observations about ending visitation, Giesick's generalized testimony that severing the parent-child bond can have adverse consequences provides us with no evidence that terminating mother's parental rights will adversely affect this child. Accordingly, neither M.P.-P. , nor the record in this case, supports the conclusion that the termination of mother's parental rights is not in K's best interests.
That leads us to our final question: Does clear and convincing evidence establish that the termination of mother's parental rights is in K's bests interests? DHS disputes mother's contention that M.P.-P. controls, much for the same reasons we have just explained. DHS further relies on the reports and testimony of Wichmann and Giesick, both of whom evaluated K.[21] We turn to that evidence, as well as the record as a whole, to determine whether DHS has sustained its burden in this case.
Wichmann, who has a bachelor's degree in psychology and a master's degree in Marriage and Family Therapy, conducted a permanency examination at DHS's request. Wichmann considered reports that DHS provided (including mother's mental health records), visited K in her foster home, observed mother and K together during a supervised *536 visit, and interviewed mother in person. She observed that mother has received mental health treatment since 2006-more than 10 years before the termination trial-and that she also had engaged in domestic violence related services; to date, Wichmann did not observe any meaningful progress on either front. Wichmann considered it significant *356 that mother had not wholly discontinued contact with RP, and that mother's older children all have behavioral and emotional issues after having experienced significant neglect in her care. She observed K to be "right on track, developmentally," with no attachment-type or other issues. Wichmann further observed that K was "securely attached" in her foster home. And, although Wichmann noted some "really nice interactions" between K and mother, and said there was "some connection * * * some evidence of connection bonding there," K's interactions with mother suggested a "less secure" attachment.
Wichmann did not specifically endorse any placement option, but she did indicate that K "needs permanency as soon as possible." Although, as noted above, such an opinion is of limited value in the abstract, Wichmann tied her opinion specifically to K's circumstances and mother's ability to meet K's needs. She observed that K is a "delightful, well-adjusted child." Wichmann further observed that, through mother's care of her older children, she had demonstrated an "inability to maintain a safe, stable home," that nothing had changed in the several years since their initial removal, and that she saw no indications that things would change in the future. Wichmann specifically noted mother's ongoing issues with dependency and unsafe relationships, as well as her apparent inability to apply the parenting skills that she had learned without direct support and supervision. Although Wichmann acknowledged that it is often best for a child to be with his or her parent, that is only true when that parent can "provide a safe, secure home with consistent nurturing, structure, boundaries, expectations, etc.," which, in Wichmann's view, mother could not provide for K "within a reasonable timeframe that meets [her] developmental needs." And, Wichmann explained, the longer a healthy child remains in foster care, the greater the risk is that the child will develop insecurities, especially *537 as the child becomes verbal and starts to better understand his or her circumstances and relationships. Moreover, that concern grows when children are pulled in and out of foster care, as was the experience of mother's older children, even if K had not yet had to endure that pattern.
Giesick similarly advocated for permanency now and, in her view, the best permanency outcome for K is adoption. As noted, she testified that, as a general matter, the optimal age for adoption is sometime between the ages of zero and five. We note that K was two years old at the time of the termination trial, and that an argument could be made that Giesick's testimony suggests that K could wait up to three more years without suffering adverse consequences. We do not take her testimony that way. For one thing, Giesick specifically testified that the sooner a healthy child is placed for adoption, the better the attachments the child is likely to form with his or her adoptive parents. For another, the idea that extended foster care would have no adverse consequences for K assumes that there are no adverse consequences from that arrangement itself, including the possibility of changing foster care providers, going in and out of mother's care, or both. As mother's history with all eight of her other children demonstrates-and as Wichmann's testimony intimated-there is no reason to believe that K will avoid repeating such experiences if she is left to wait in foster care.
Finally, although our focus remains on K, there is no reason that we must consider her circumstances in a vacuum, without considering the voluminous evidence of mother's progress-or lack thereof-in regard to the health, safety, and development of her other children and what that history portends for K if mother retains her parental rights. We need not repeat that evidence here. We do note that mother has from time to time throughout the history of this case suggested that her deficiencies as a parent result not from her own lack of abilities or efforts, but from the fact that she has invariably and understandably been overwhelmed by the task of parenting many children-most of whom have high needs-without assistance from their fathers and without the training that she now has received. There is no evidence, however, that mother's repeated *538 behaviors of exposing her children to dangerous individuals, failing to respond to their emotional and behavioral needs, and, ultimately, *357 failing to implement what she had learned from her service providers, have been measurably different depending on whether she had one child in her care or eight. Thus, like Dr. Truhn, we must reject that argument. And, therefore, we are persuaded, by clear and convincing evidence, that it is in K's best interests that mother's parental rights be terminated. Accordingly, we affirm.
Affirmed.

K's biological father, RP, Jr., (RP) has relinquished his parental rights and is not a party to this case. Mother's eldest two children, J and A, live out of state with relatives of their father, JV. The juvenile court placed two of mother's children, Ka and Kh, with their father, SR-D, after DHS removed them from mother's home in 2014. Four children, L, M, T, and H, mother's third, fourth, fifth, and sixth children, who are the children of mother's husband, TB, are in DHS custody subject to a permanency plan of guardianship. The juvenile court changed the plan for those four children to guardianship in the permanency hearing that resulted in the change of K's plan from reunification to adoption; mother did not appeal either ruling. This appeal involves only the termination of mother's parental rights to K, her youngest child.

Although mother's appeal challenges only the termination of her parental rights to K, much of the procedural and factual history regarding her other children was introduced into evidence during the termination trial and provides valuable context for assessing whether DHS has satisfied its burden of proof as to K. Accordingly, we summarize some-but far from all-of that history.

In 2010, DHS had filed a dependency petition involving mother and her eldest five children, alleging, among other things, that the children had been subjected to a threat of harm-physical abuse or mental injury-due to their presence during incidents of domestic violence perpetrated against mother by TB. Of particular concern to DHS at the time was mother's view that TB was not a threat to her children because it was "just domestic violence."

A DHS worker described mother's home as below community standards, due to excessive clutter and garbage, various fire and choking hazards, dirty and inadequate bedding, and generally unlivable conditions, and described the children themselves as dirty, half-clothed, and, as to one child, "almost feral-like." Mother told DHS at the time that "she had been overwhelmed and didn't feel that the [voluntary] services [that DHS had been providing] were helping her."

"ISRS" refers to "In-home Safety Reunification Services," which are one-on-one, hands-on parenting training services provided through DHS.

RP subsequently gave a different account of those events, in which he had been at mother's home playing a video game on his phone when mother "entered the room and began accusing him of talking to other girls on the phone." According to RP, he had been cut when, after leaving the home, he reached back through a window to grab a shoe that he had left behind, and mother slammed the window on his hand. Mother did not dispute that account when confronted with it later.

Mother does not appear to have mentioned possible drug use by RP at the time of the stroller incident in December 2015, and she testified that she did not believe he was using drugs in March 2016. RP, on the other hand, testified that he had limited recall of the stroller incident because he "was in a meth psychosis" at the time.

Based on the information before it at the time, the juvenile court specifically found that RP had broken the window of mother's living room, entered the apartment, and threatened her. As noted, the court heard conflicting evidence regarding those circumstances at the termination trial. There has never been any dispute, however, that RP was unlawfully at mother's home that night, or that the resulting circumstances-which included mother barricading herself in a bedroom with H and K-were ultimately traumatic for, at a minimum, H. See 294 Or. App. at 519 (describing officer's testimony that the incident left H "traumatized," "hiding, cowering," and "scared").

According to DHS, the "Circle of Security" program, which the juvenile court ordered in addition to the parenting training it had previously required mother to attend, is an "attachment-based * * * parenting and therapy program."

The authors of each of those reports also testified at the termination trial.

Giesick's 2017 psychological reports for L, M, T, and H all reference earlier evaluations for those children. Any earlier reports were not, however, made part of the record at K's termination trial, although, in addition to using them for comparison purposes in the 2017 reports, Giesick also referenced them in her testimony.

Giesick's understanding, which was corroborated at trial, was that, at the time of his removal, L's behavior at school-including destroying property and leaving school at will-was making him impossible to teach and a safety threat to himself and others. Giesick also understood that mother was not meeting L's needs at the time and had, for example, repeatedly failed to get L to his counseling appointments. Notably, T showed similar behavior at his own school.

Other witnesses, including DHS workers who had observed mother during her visitations with K, indicated that mother and K shared a strong bond at some point prior to trial, and DHS does not dispute that mother and K are attached. Mother does not argue, however, against the conclusion that, at present, K's primary attachment figure is her foster mother.

As noted above, following the removal of her children in early 2015, mother admitted that she continued to lack the parenting skills needed to safely parent, and that she had not met her children's behavioral and psychological needs.

Mother ultimately completed the approximately 10-week long Circle of Security program with K as many as three times.

The juvenile court specifically concluded that, based upon the allegations of the petition, the following conduct or conditions rendered mother unfit: (1) an emotional illness, mental illness, or mental deficiency of such nature and duration as to render the parent incapable of providing care for extended periods of time; (2) exposure of the child to domestic violence; (3) failure to present a viable plan for the return of the child; (4) lack of effort or failure to obtain and maintain a suitable or stable living situation for the child; (5) failure to learn or assume parenting skills sufficient to provide a safe and stable home; and (6) lack of effort to adjust, or failure to effect a lasting adjustment in, the parent's circumstances, conduct, or conditions after reasonable efforts by available social agencies for such an extended duration of time that it appears reasonable that no lasting change can be effected.

Mother does not contend that DHS has failed to meet its obligation to provide the services reasonably necessary to achieve reunification.

One of the many reasons that the court could disbelieve mother's assurances regarding RP is the evidence of how her dependent personality disorder caused her to allow TB back into her life, even though he was at least as much of a threat as RP. As mother acknowledges, after promising DHS that she would not have contact with him after he completed a prison sentence for head-butting her, mother not only resumed contact with TB, she also had a fourth child with him.

We note that, although the permanency plans for L, M, T, and H call for the establishment of guardianships rather than adoption, we understand those decisions to have been primarily based on considerations other than mother's ability to adjust her circumstances or the attachments those children have to her, such as their identified therapeutic and other special needs and their attachments to each other.

Indeed, although Giesick acknowledged that the strength of the parent-child bond or attachment is an important consideration when deciding whether to terminate a parent's rights, she had not considered that issue. We understand that to have been because she was not given an opportunity to assess that bond in this case, given K's young age and other circumstances, rather than due to any inadequacy in her assessment.

DHS also relies extensively on an argument, premised on the Supreme Court's opinion in State ex rel Juv. Dept. v. Geist , 310 Or. 176, 796 P.2d 1193 (1990), and the legislative history of the termination statutes, that termination of parental rights is the default outcome once the statutory grounds for termination are proved. As in T. M. D. , 292 Or. App. at 131, 423 P.3d 88, it is unnecessary to consider that argument further in this case.