440 January 7, 2026 No. 9

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of K. S.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

M. N. B.,
*Appellant.*

Multnomah County Circuit Court
23JU05047;
Petition Number 114923;
A187323

Michael J. Riedel, Judge.

Submitted September 26, 2025.

Ginger Fitch and Youth, Rights & Justice filed the brief for appellant.

Dan Rayfield, Attorney General, Benjamin Gutman, Interim Deputy Attorney General, and Emily N. Snook, Assistant Attorney General, filed the brief for respondent.

Before Tookey, Presiding Judge, Egan, Judge, and Jacquot, Judge.

JACQUOT, J.

Affirmed.

**JACQUOT, J.**

Mother appeals from a permanency judgment changing the plan for her son, K, from reunification to guardianship.[1] She separately contests the juvenile court's determinations that further efforts would not make it possible for K to safely return to her within a reasonable time and that the Oregon Department of Human Services (ODHS) has made reasonable efforts to reunify K with parents. Both determinations are intermediate decision points within the structure of ORS 419B.476; a reasonable efforts determination is a prerequisite to a plan change while a "further efforts" determination is a discretionary alternative to changing the plan despite reasonable efforts on behalf of ODHS and insufficient progress on the part of the parent/(s). We affirm the plan change and each of the challenged intermediate determinations.

In this opinion, we begin by addressing mother's request for *de novo* review of certain statements by the court, and noting that *de novo* review only applies to factual findings, we determine that one finding by the juvenile court warrants *de novo* review. Next, because mother challenges a variety of determinations by the court, we explain the standard of review applicable to each challenged determination. We then provide relevant factual and procedural background, before addressing each assignment of error.

In our analysis of mother's arguments, we address mother's third assignment of error, regarding reasonable efforts, first; we then turn to her second assignment of error, regarding whether safe return is possible within a reasonable time; lastly, we address her first assignment of error, that the court erred by changing K's permanency plan from reunification to guardianship. We do so to follow the order of decision-making required when a court orders a change in permanency plan.

---

[1] Father is a party in the underlying dependency proceedings and does not appear on appeal. At appropriate points throughout the life of the case, the juvenile court determined that jurisdictional bases exist in relation to father, that Oregon Department of Human Services has made reasonable efforts with regard to father, that father has not made sufficient progress, and that father is unable to provide care for K.

### I.  STANDARD OF REVIEW AND REQUEST FOR *DE NOVO* REVIEW

As noted, mother requests *de novo* review with regard to several statements the court made in its detailed and well-reasoned letter opinion. In juvenile proceedings that do not involve the termination of parental rights, there is a presumption against granting *de novo* review, and we do so only in exceptional cases. *Dept. of Human Services v. N. S.*, 246 Or App 341, 344, 265 P3d 792 (2011), *rev den*, 351 Or 586 (2012); ORAP 5.40(8)(c); ORS 19.415(3) (In an equitable appeal other than one regarding termination of parental rights, "acting in [our] sole discretion, [we] may try the cause anew upon the record or make one or more factual findings anew upon the record."). ORAP 5.40(8)(d) sets out nonbinding, nonexclusive considerations for determining whether to exercise that heightened level of examination of the record, including whether the court's decision comports with uncontroverted evidence in the record.[2]

Mother objects to the juvenile court's factual finding that the department provided "regular family decision meetings" from "October 2023 to present." She also objects to the juvenile court's statement that K "has a high need for permanency[,] *** [p]rolonging this uncertainty is not in his best interests[,]" and multiple other statements that are not factual findings at all, but are intermediate conclusions that the court drew from the evidence presented to it.[3]

Regarding the family decision meetings, mother argues that the record shows that there were only two family decision meetings between August 2024 and the permanency hearing that took place in February and March

---

[2]  Other ORAP 5.40(8)(d) criteria include, in illustrative part, whether the court made express factual findings, whether any findings by the court were demeanor-based credibility findings, whether the court made specific reference to a disputed factual matter and its importance, and the likelihood of whether a factual determination made in favor of the appellant would alter the outcome.

[3]  They include:

"time is highly likely to only result in a continued pattern of failed progress with substance abuse treatment"; "the type of progress needed would take much longer than is reasonable for [K];" and "[i]t would require many more months of treatment, followed by extended sobriety, followed by transition from full supervision of parent-child to [m]other being able to safely care for [K] on her own."

2025. In contrast, ODHS's court report indicated there had been monthly family decision meetings. The juvenile court's factual finding indicating there had been "regular family decision meetings" over a longer time period—consisting of the entire time ODHS has been involved with K—does not directly conflict with either contention. Due to the centrality of family decision meetings to mother's reasonable efforts argument, the fact that we have no quantification of what the court meant by "regular," and the factual discrepancy in the record, we exercise *de novo* review to determine anew when family decision meetings were provided as a component of reviewing whether ODHS's efforts were reasonable. The other statements challenged by mother are not proper subjects of *de novo* review because they involve deliberative conclusions drawn by the juvenile court from the evidence presented to it.

Except for the finding about how frequently family decision meetings occurred, we apply our ordinary standard of review for appeals regarding permanency plans. "The juvenile court's determinations whether [O]DHS's efforts were reasonable and the parent's progress was sufficient are legal conclusions that we review for errors of law." *Dept. of Human Services v. G. N.*, 263 Or App 287, 294, 328 P3d 728, *rev den*, 356 Or 638 (2014).

We consider the evidence in the light most favorable to the juvenile court's disposition. *Dept. of Human Services v. C. H.*, 373 Or 26, 46-47, 559 P3d 395 (2024). We are bound by the juvenile court's findings about ODHS's efforts, so long as there is any evidence in the record to support them, and we assume the juvenile court found all facts necessary to its ruling, even if it did not do so explicitly. *Id.* We examine whether the facts explicitly and implicitly found by the juvenile court, together with all inferences reasonably drawn from those facts, were legally sufficient to support the juvenile court's decision that reasonable efforts were made. *Id.* at 48 (citing *Dept. of Human Services v. Y. B.*, 372 Or 133, 151, 546 P3d 255 (2024)). We review the court's legal conclusion regarding whether a parent has made sufficient progress under the same standard—"to determine whether the evidence was sufficient to support it." *Y. B.*, 372 Or at 136.

In order to change a permanency plan away from reunification, the juvenile court must determine that ODHS has met its burden to prove, by a preponderance of the evidence, facts that support a change to K's permanency plan, including that the agency made reasonable efforts to enable a safe reunification of K and parent and that the parent has not made sufficient progress toward that goal. *Dept. of Human Services v. T. R. P.*, 344 Or App 375, 378, ___ P3d ___ (2025).

## II.   FACTS

These relevant facts are taken primarily from the juvenile court's letter opinion. Throughout K's life, he has always been in the care of mother, the maternal grandparents, or both; K has strong familial bonds with all three adults. K was born substance-affected in June 2022. At birth, ODHS began cooperative engagement with mother due to her substance use (mainly methamphetamine) and father's substance use, criminal activity, and developmental delays. The plan involved mother and K living with K's maternal grandmother to start. Mother participated in various voluntary services and safety plans for 15 months, relapsing four times. The court identified a pattern: "During this period, a pattern emerged of [m]other doing well engaging in services resulting in a loosening of the safety plan only to be followed by decreased engagement, communication issues and a relapse of some sort."

Mother started in outpatient treatment. After her first relapse in November 2022, she was offered a recovery mentor. Mother was engaged in treatment but was relying on grandmother to parent while she was absent for days without notice. She relapsed in February 2023 on alcohol and methamphetamine. Mother was offered inpatient treatment, she engaged well and graduated. She transitioned with K to sober living and outpatient treatment in June 2023. In July 2023, she relapsed, using methamphetamine with K present. ODHS held a family decision meeting. It offered in-home rehabilitative services and a parent mentor to mother, but she did not accept them. Mother continued in outpatient treatment and clean and sober living, but she violated the rules, stayed away overnight, and missed treatment for four

weeks in September 2023. When confronted with the established pattern, mother acknowledged it.

There was another family decision meeting, and mother again agreed to participate in treatment. But she continued to violate the community rules at her clean and sober living facility. ODHS had concerns about mother's boyfriend and his own child-welfare history, mother driving unsafely (possibly with K) and thereby losing her driver's license, missing her own and K's appointments, and the fact that she was terminated from her housing. The agency filed a jurisdictional petition in October 2023. Jurisdiction was based upon mother's admissions on April 26, 2024, to the following conditions and circumstances: "Mother has a pattern of substance abuse that interferes with her ability to safely parent the child despite having participated in services to address this problem[;]" and "[m]other's residential instability, employment instability and financial instability interfere with her ability to safely parent the child."

Mother was referred to Cascadia for substance use treatment. She submitted urinalyses showing methamphetamine use again in June 2024 and missed other requested tests. She reengaged and did well until October 2024, but she relapsed again and did not complete a required relapse prevention plan. Mother stopped attending treatment when she learned she would be required to restart.

Mother voluntarily enrolled in substance use treatment with a new provider, Lifeworks Northwest, in November 2024. ODHS had concerns that mother was not honest with them, resulting in her being assigned to complete a lower intensity of treatment than she needed. "In late November, ODHS had a phone call with mother in which she was groggy and slurring her words consistent with substance abuse."

In late 2024, mother was also participating in visits with K at The Family Room. Mother often had trouble staying awake, and the providers noted some safety concerns. She cancelled visits and "no-showed" to others, and her visits were suspended in November 2024.

The court noted, "Between September and November, ODHS scheduled two family engagement

meetings. Mother no showed for one, logged in late and had to leave early for the second. Another family engagement meeting was scheduled for December 2."

Between December 2024 and early February 2025, mother had problems with Lifeworks. She did not attend as she was supposed to and submitted a urinalysis full of toilet water when asked for a urine sample. Mother was put on a contract requiring her to fully engage in treatment or be terminated from the service.

Mother attended and produced clean urine tests in January and February but remained subject to the full compliance contract. The court understood the recent progress as evidence of "the seemingly intractable pattern of eventual relapse over the life of this case."

With regard to the frequency of family decision meetings, the factual issue which we have reviewed *de novo*, we have examined the record and find that the department offered at least ten meetings over the course of the case, including three between the court's prior finding about reasonable efforts in September 2024 and the permanency hearing at issue in this appeal. Of those, mother canceled one and logged in late and left early from another. ODHS seems to have rescheduled the last one from December 2 to December 9, and mother had asked for an additional meeting after that one, but the agency had not yet offered one. There was also a period of about four-and-a-half weeks where mother's Family Room visits were suspended because mother needed to attend a meeting with the caseworker and service provider in order to restart them. It took some time to coordinate the schedules of the necessary parties.

## III.   ANALYSIS

### A.   *Reasonable Efforts*

ORS 419B.476 requires the court to first determine that ODHS has made "reasonable efforts" to reunify the family before considering a change to a different permanency plan for a child;[4] we begin our analysis there.

---

[4] ORS 419B.476(2) sets out, in relevant part, the court's task at a permanency hearing when the plan at the outset is reunification.

Mother's argument is based on her contention that ODHS did not provide sufficient family engagement or family decision meetings to collaboratively come up with a plan to return K to mother or increase her responsibility in caring for K. In light of the facts found by the juvenile court and supported by the record, we determine that ODHS provided longstanding and patient efforts to work with mother. The initial 15 months of K's life involved a cooperative in-home plan with K in mother's care. After he was removed, mother was ordered to address her substance use and complete treatment. The court credited the caseworker's testimony that mother had never maintained sobriety for more than a few months since; that, per treatment reports, her engagement was mixed, at best; and that she was at the beginning of addressing her substance use disorder.

With regard to family meetings, it is clear from the record that mother enjoyed them and was motivated to re-engage more than once after a meeting was held. On the other hand, mother did not always take advantage of them. We address reasonable efforts by evaluating the totality of the circumstances and over the course of ODHS's involvement with the family. *C. H.*, 373 Or at 51.

> "[T]he reasonableness of [O]DHS's efforts must be evaluated in light of the bases for jurisdiction identified in the juvenile court's judgment. Efforts are reasonable when the agency has taken appropriate steps under the circumstances to give parents a full and fair opportunity to remediate the bases for jurisdiction to become at least minimally adequate parents ***."

*Id.* at 50. The court and all parties, including mother, treated mother's substance use as the primary problem resulting in jurisdiction and contributing to mother's housing and employment instability. Considering the totality of the circumstances, we readily determine that ODHS made

---

"At a permanency hearing the court shall:

"(a) If the case plan at the time of the hearing is to reunify the family, determine whether the Department of Human Services has made reasonable efforts or, if the ward is an Indian child, active efforts as described in ORS 419B.645 to make it possible for the ward to safely return home and whether the parent has made sufficient progress to make it possible for the ward to safely return home. In making its determination, the court shall consider the ward's health and safety the paramount concerns."

reasonable efforts to address the jurisdictional problems. For example, prior to jurisdiction being established, the record indicates that ODHS collaborated with mother over a long period of time to help maintain K in her care while also supporting her treatment efforts.

Mother argues, "[I]n the months leading up to the permanency hearing, [ODHS] failed to provide critical services to support [mother]'s recovery journey and reunification with [K]: family decision meetings and a transition-home plan. The department adduced no evidence that those supports would have been expensive or otherwise burdensome to provide." We observe that ODHS did provide regular opportunities for meetings and that the caseworker and mother's service providers thought a transition plan was premature. The court drew an inference from the many relapses after many successful short periods of sobriety that a longer and more solid demonstration of sobriety would be necessary before K could be safe in mother's care.

Her next argument is that minimal services were offered to address the second jurisdictional basis, mother's instability. There were some. Mother was offered clean and sober housing, transportation assistance, and a parent mentor, and the caseworker indicated that all of those resources offered tools to address mother's instability. Ultimately though, the caseworker indicated that it was most important to address mother's substance use first. We recently approved the practice of offering serial services if one problem is preventing the parent from addressing others. In *Dept. of Human Services v. H. C.*, 344 Or App 302, 311, ___ P3d ___ (2025), we held, "When multiple jurisdictional bases are interrelated such that one arises out of another, ODHS may focus efforts on the more foundational basis." That is what happened here. Mother's inability to make sustained progress toward sobriety derailed efforts to help her to stabilize over the course of K's first three years of life.

Mother's last reasonable efforts argument is that the court failed to complete a cost-benefit analysis to determine whether the agency was required to offer more planning meetings and that, because such meetings are not expensive or burdensome to provide, the agency was not

reasonable in denying mother's requests for more. "In other words, the court should have considered the totality of the circumstances related to the reasonableness of [O]DHS's reunification efforts, including both the potential benefits of providing services and the burden of associated costs." *Dept. of Human Services v. M. K.*, 257 Or App 409, 418-19, 306 P3d 763 (2013).

The court implicitly engaged in the required analysis when it found that the agency made reasonable efforts in light of mother's argument and the caseworker's testimony that mother did not always fully participate. There was also evidence in the record showing that sometimes it was difficult to coordinate schedules of necessary parties and providers, sometimes impromptu meetings occurred even when a formal family planning meeting did not, and the permanency worker testified that formal meetings were "not always a good tool for actually understanding what's going on in this case," because mother would consistently report things were going well while providers would report challenges or concerns. ODHS carried its burden to establish that it made reasonable efforts to reunify the family.

B. *Further Reunification Efforts*

We continue addressing mother's arguments in the order of decision-making required for a plan change decision as set out in ORS 419B.476.

After the court has determined that ODHS has made reasonable efforts and a parent has not made sufficient progress to safely return home at the time of the hearing, ORS 419B.476(4)(c) gives the parent the opportunity to argue, and for the court to consider, continuing the reunification plan in some circumstances. It provides, as relevant here,

"(4) At a permanency hearing the court may:

"* * * * *

"(c) If the court determines that further efforts will make it possible for the ward to safely return home within a reasonable time, order that the parents participate in specific services for a specific period of time and make specific progress within that period of time[.]"

Mother's next argument is that the court should have done so in this case, given her recent progress in treatment. As mentioned above, the juvenile court determined that further efforts would not make it possible for K to return home within a reasonable time. That determination is evaluated for abuse of discretion. *See* ORS 419B.476(4)(c) (providing that a court "may" make such a determination); *see also Y. B.*, 372 Or at 145-6 (describing the juvenile court's discretion in making such a determination). The proponent of the plan change bears the burden to show that reasonable efforts will not make it possible for the child to return home within a reasonable time. *Dept. of Human Services v. S. J. K.*, 296 Or App 416, 419, 439 P3d 578 (2019). "'Reasonable time' means a period of time that is reasonable given a child or ward's emotional and developmental needs and ability to form and maintain lasting attachments." ORS 419A.004(26).

The juvenile court's determination indicating that, for the last three years, mother had been engaged in an unstable pattern of treatment with brief sobriety followed by relapse is supported by the record, and deciding not to continue to require ODHS to provide reunification services to mother was a legally permissible option given the court's previous reasonable-efforts and insufficient-progress determinations. *See, e.g.*, *Dept. of Human Services v. D. I. R.*, 285 Or App 60, 64-68, 72, 395 P3d 970 (2017) (illustrating that patterns of parents relapsing to substance use can support a court's determinations to change a permanency plan away from reunification).

Mother argues that the court's determination that "[K] needs permanency now" is like the evidence rejected in *Dept. of Human Services v. T. L. B.*, 294 Or App 514, 533-36, 432 P3d 343 (2018), *rev den*, 365 Or 556 (2019)—that is, it is "of limited value in the abstract." She argues that the evidence lacks the child-specific information that would make it persuasive.

We disagree with mother. Here, ODHS had K evaluated by Dr. Bailey, a child psychologist from The Children's Program. Although many of her recommendations would apply to most three-year-olds, she had the opportunity to observe K displaying behaviors consistent with those expectations.

She administered questionnaires about him to the grandparents, who had been very involved with him since birth and were his current resource parents. Bailey also reviewed K's medical, ODHS, and Education Service District records. She described K as being diagnosed with "Global Cognitive Delay" and involved with early intervention. The resource parent reported to Bailey that K would display difficult behaviors after hard visits, but if the visits were described as going well, he could transition happily between caregivers. K sometimes has tantrums but mostly has a good disposition. He receives speech and physical therapy. K showed "visible attachment" to his grandfather, who brought him to the observation session, and K showed average self-control and below average motor skills. The evaluation acknowledges positive information received regarding mother's parenting and K's interactions with her on good days.

With regard to permanency, Bailey indicated that, because of his exposures to prenatal stress and drugs, he is at increased risk for challenges in forming and maintaining attachments and may experience problems with behavior, attention, reasoning, academics, and language. She recommended an enriched learning environment, developmentally appropriate activities, and community involvement similar to other normal children his age with "early life psychosocial stressors." She stated, "He requires an engaged, stable and consistent caregiver to support healthy development." She recommended a "structured and predictable environment" and recommended against future transitions in caregivers, opining that they would increase his risk for future problems. Like many such evaluations, Bailey stated in her report, "[K] is a child with a high need for permanency and at the highest level of permanency afforded to him." Bailey explained, "Infants and toddlers are particularly sensitive to loss of attachment figures." She continued, "remaining in resource care indefinitely as well as a failed reunification with a parent, increases [K]'s risk of exacerbated or new mental health issues, negative outcomes, and difficulties developing and maintaining healthy attachments to caregivers." She recommended against placing him in an environment where he was at risk of abuse or neglect, exposure to violence or substance abuse or inconsistent caregiving. She said that

"further exposure from what he has already experienced will likely have a compounding effect and greatly increase his risk." She made recommendations for future support he might need and pointed the resource parents to resources they could use in the future if problems arose.

Much of the information in Bailey's report would apply to many children—most children who are the same age as K and all who have had similar experiences and disabilities as those that K presented with. Nonetheless, the recommendations are linked to K's developmental stage and specific demonstrated behaviors. They are made referring to multiple data points and based on interaction with K. The record is sufficiently detailed and child-specific to avoid running afoul of *T. L. B.*, 294 Or App at 536 (recognizing that permanency recommendations tied "specifically to [a child's] circumstances and [a parent's] ability to meet [the child's] needs" can be valuable). Thus, the record supports the court's determination that K needs permanency.

The record also supports the juvenile court's determination that mother would not be ready to parent within a reasonable time given that mother would first need to establish sobriety, then stabilize, and then work to transition K into her care. Giving her the benefit of her argument that her two months of clean tests and "mixed" engagement in treatment was positive indication of her progress, a number of witnesses indicated that she had many months to go before K could be safely in her home. The juvenile court did not abuse it's discretion by not identifying further efforts and services before changing the plan.

C.  *Permanency Plan Change*

The final assignment of error we address was the first raised by mother. She argues, "The juvenile court erred in changing [K]'s plan away from reunification to guardianship."

ORS 419B.476(5) provides, in relevant part:

"The court shall enter an order within 20 days after the permanency hearing. In addition to any determinations or orders the court may make under subsection (4) of this section, the order shall include the following:

"(a) The court's determinations required under subsections (2) and (3) of this section, including a brief description of the efforts the department has made with regard to the case plan in effect at the time of the permanency hearing.

"(b) The court's determination of the permanency plan for the ward that includes whether and, if applicable, when:

"* * * * *

"(C) The ward will be referred for establishment of legal guardianship;

"* * * * *

"(e) If the court determines that the permanency plan for the ward should be establishment of a legal guardianship, the court's determination of why neither placement with parents nor adoption is appropriate."

Given the juvenile court's supported conclusions that ODHS had made reasonable efforts and that the parents had not made sufficient progress after three years for K to be returned to either parent safely, the arguments that remain are that K is highly bonded to mother, that mother is "strongly connected to her family and extended family," and that she parented in a way that was "sweet and gentle" with K. ODHS requested a plan change and the court selected a plan of guardianship with the grandparents due to this bond, finding that "adoption is not appropriate due to [K]'s bond with mother."[5] There is information in the record showing that the grandparents are suitable and willing to accept the role of legal guardians for K. Thus, the court did not err in changing the permanency plan to guardianship. *See Dept. of Human Services v. J. L. S.*, 345 Or App 75, 77-79, ___ P3d ___ (2025) (explaining a juvenile court's role regarding guardianship planning and petitions).

Affirmed.

---

[5] At the time of the permanency hearing, ODHS advocated for a durable guardianship under ORS 419B.366. If the court establishes a durable guardianship, we note that mother, the guardians, or K can move to vacate wardship or the guardianship in the future should mother's circumstances improve such that she can show she is safe for K to be returned to. *See, e.g.*, *Dept. of Human Services v. J. C.*, 365 Or 223, 225-229, 444 P3d 1098 (2019) (regarding motion to vacate a guardianship).